The State v. Patterson.

---

THE STATE v. PATTERSON, *Appellant*.

1. **Pleading, Criminal.** It is no ground of objection to an indictment that the names of the material witnesses for the State were not indorsed on it when it was found; or, when the crime charged is murder, that it alleges two assaults in one count, or that it alleges that divers mortal wounds were inflicted whereof the deceased died, without specifying which one caused the death.

2. **Criminal Law and Practice.** It is competent for the grand jury of the county where one indictment has been found, to find another for the same offense, notwithstanding the first has been sent to another county for trial on change of venue; and as soon as the first is *nol. pros'd*, the second becomes triable in the county where it was found. It is not the duty of the court in that county to send it to the other county.

3. **Confessions of Crime.** The law is now settled that a confession of crime, to be inadmissible, must have been made to an officer of the law, in consequence of improper influence exerted by him.

   It is for the trial court, in each case, to determine, as a preliminary question whether the confession was made with that degree of freedom which ought to occasion its admission; and unless there is manifest error in the ruling, its admission should not cause a reversal of the judgment.

The fact that the prisoner's feet were tied at the time of making the confession, does not render it inadmissible.

4.  **Proof of Corpus Delicti.**  An extra-judicial confession of murder, uncorroborated, is insufficient to authorize conviction; but where the accused has expressly admitted that he did murder the deceased, it is unnecessary that the dead body be positively and directly identified.  It is sufficient that there be such extrinsic corroborative circumstances, as will, taken in connection with the confession, produce conviction of defendant's guilt in the minds of the jury.

5.  **Evidence.**  Evidence of the fact that a letter was mailed at a particular place may be admissible, where proof of its contents would not be.

*Appeal from Henry Circuit Court.*—Hon. Jas. B. Gantt, Judge.

Affirmed.

*R. C. McBeth* and *M. A. Fyke* for appellant.

The indictment should have been quashed, because the names of the material witnesses were not indorsed thereon when the same was found by the grand jury, as required by Revised Statutes 1879, section 1802, and because the same is multifarious, vague and uncertain.  Defendant in the same count is charged with making two assaults upon deceased, each complete in itself, and with inflicting upon deceased several different mortal wounds, but it does not appear with sufficient certainty of which of said wounds deceased died.  *State v. Reakey,* 62 Mo. 40.  The Henry circuit court had no jurisdiction after the change of venue to Morgan; and finding a new indictment could not re-invest the jurisdiction.  If a new indictment became necessary on account of any defect in the first, it was the duty of the Henry circuit court to certify it to Morgan county.  Even had the two courts concurrent jurisdiction, a plea in bar to the second indictment would have been good.  *State v. Yarbrough,* 1 Hawks (N. C.) 78; *State v. Tisdale,* 2 Dev. & Bat. 159; *Paris v. State,* 36 Ala. 232.  The court erred

in admitting the confessions of defendant. It does not appear that they were voluntarily made. In determining this question all the circumstances ought to be considered. They should not have been received unless clearly shown to have been voluntary, because about twelve years had elapsed, and the memory of witnesses is too treacherous to warrant a conviction upon such evidence. There was not sufficient proof of the *corpus delicti* to warrant a conviction. There is no evidence that James G. Clark is dead. No witness who was present at the inquest was asked to describe him, nor was any such description given as would enable one to identify him. The confessions of defendant even if held admissible, are not of themselves sufficient to establish the identity of James G. Clark. *State v. German,* 54 Mo. 526; *Matthews v. State,* 55 Mo. 187; Whart. Am Crim. Law, (5 Ed.) § 746. The instructions asked by defendant as to murder in the second degree ought to have been given.

*D. H. McIntyre,* Attorney General, and *C. C. Dickinson,* Prosecuting Attorney, for the State.

Failure to indorse the names of the State's witnesses on the indictment, did not affect its validity, but only the State's right to a continuance. *State v. Nugent,* 71 Mo. 145. It is not error to charge two assaults in the same count. 3 Chitty Crim. Law, 764, 777; 12 Cush. 619; 56 N. Y. 100. Defendant's motion to remand, was properly overruled. The transcript of the record from the Morgan circuit court showed that the indictment theretofore pending against defendant for the same offense had been dismissed. R. S. 1879, § 2321. The evidence of the confessions of defendant was admissible. There was nothing to show that they were induced by hope on the one hand, or by fear or intimidation on the other. The mere fact that defendant was in custody when they were made does not render them inadmissible. *State v. Simon,* 50 Mo. 372;

*State v. Carlisle*, 57 Mo. 104, 105; *State v. Talbott, ante,* p. 347; *State v. Guy,* 69 Mo. 430. The evidence is explicit and positive that no inducements of any kind were held out to defendant. But confessions obtained by artifice, or in answer to questions, are admissible. *State v. Jones,* 54 Mo. 478; *State v. Staley,* 14 Minn. 105; *Miller v. State,* 40 Ala. 54; *Com. v. Whittemore,* 11 Gray 201; *Com. v. Cuffee,* 108 Mass. 285. And the fact that a prisoner is urged to confess, or is told that it would be better for him to tell the truth, will not exclude his confessions. 7 Mo. 190; 8 Ohio St. 98; *State v. Howard,* 17 N. H. 171. It could make no difference even, if the confessions were made when the prisoner was tied. If voluntary, they were admissible. *Franklin v. State,* 28 Ala. 9. There was sufficient evidence to show that the name of the murdered man was James G. Clark. The witness, Bradley, testified that he saw the body of the dead man on the prairie, and recognized him as the man who had stayed at his house the night of the 2nd of December, and who had said his name was Clark. Cory testified that he knew James G. Clark; that he went away the last of November, 1868; that he sent by him for 200 yards of trout line, 100 fish hooks and a pair of steelyards ; that Clark never came back, but property, such as he had sent for by Clark, was left at Clark's place and sold by his administrator. Maxwell, one of the men who arrested Patterson in Illinois, testified that he said to him " I arrest you for the murder of James G. Clark in Missouri in 1868," and defendant said, " I am your man, I did it." It is presumed that defendant knew the full name of deceased, as he had been in his employ and became possessed of his money and other things calculated to reveal the christian name of deceased. The admission of defendant was that he had killed James G. Clark. Other facts and circumstances in evidence tended to show the same thing. From the evidence in the case the court was not warranted in instructing for murder in the second degree. 71 Mo. 425; *State v. Talbott, supra.*

## I.

Sherwood, C. J.—The sufficiency of the indictment will first be examined.

It is no ground of objection that the names of the material witnesses for the State were not indorsed thereon. The only consequence growing out of such failure is, that no continuance on account of the absence of such witnesses will be granted the State, save upon the affidavit of the prosecuting attorney. R. S. 1879, § 1802; *State v. Nugent*, 71 Mo. 136. Besides, the names of the principal witnesses were indorsed on the indictment prior to the motion to quash.

Nor is the indictment obnoxious to objection because of any supposed vagueness or other uncertainty; because charging two assaults in one count, or because it charges divers mortal wounds were inflicted, whereof the deceased died. It was proper to charge two assaults in the same count, if this was in accordance with the facts. For sometimes the murderous result is only attained after repeated assaults, and is as much attributable to one assault as to another. 3 Chitty Crim. Law, 764, 777; *Com. v. Stafford*, 12 Cush. 619; *People v. Davis*, 56 N. Y. 100.

And it was equally competent to charge that death occurred as the result of several mortal wounds, without specifying which one caused death, as this would not have been susceptible of proof, and the charge need not be more definite than the evidence requisite to support it. In the *State v. Draper*, 65 Mo. 335, the concluding words of the charge were: "In and upon the breast of him, the said Gilbert, and in and upon the belly of him, the said Gilbert, four mortal wounds, etc., of which said mortal wounds the said Gilbert did then and there instantly die;" and held sufficient. Under our statute relating to practice in criminal cases, "No indictment shall be deemed invalid, nor judgment thereon arrested, for want of any averment

not necessary to be proved." 2 Wag. Stat., pp. 1090, 1091, § 27; *State v. Edmundson*, 64 Mo. 398.

The concluding words of the charge here are: "Of which said mortal wounds, and the mortal wounds, bruises and contusions inflicted as aforesaid, the said James G. Clark then and there died," and we hold them sufficient.

## II.

No error occurred in overruling the motion to remand the cause to Morgan county. It is true that a change of venue had been taken to the circuit court of that county, but subsequently to that time the indictment on which the defendant was tried was found, and after its finding and before the motion aforesaid was filed, a *nolle prosequi* was entered in the Morgan circuit court. It would, therefore, in the circumstances detailed, have been as palpably erroneous to have granted the motion, and by granting it sent the cause to the circuit court of Morgan county, as it would have been to have sent the cause to any other circuit court whatsoever; because the jurisdiction of the Morgan circuit court over the case ceased at once when the action we have stated was taken. And it was perfectly competent for the grand jury of Henry county to find the second bill of indictment, notwithstanding a change of venue had been awarded to Morgan county. The circuit court of that county was indeed possessed of the cause, but this did not prevent the grand jury of Henry county from finding another bill, any more than they would have been thus prevented, had no change of venue been taken. The jurisdiction over the cause is one thing; the power and duty to find a new bill of indictment upon whose charges that cause shall be tried, is another and totally distinct and different thing. *State v. Tisdale*, 2 Dev. & Bat. 159. Our statute expressly recognizes the right of a grand jury to find one indictment pending another, by providing that the indictment first found shall be quashed. And under that statute we have ruled that until such quashing occurs, no trial can

take place on the second indictment. *State v. Smith*, 71 Mo. 45.

At common law the rule was different. A second indictment might be found and the accused be put to trial on it, the first indictment being undetermined. *Com. v. Drew*, 3 Cush. 279, and cases cited; *Dutton v. State*, 5 Ind. 533, and cases cited; 1 Whart. Crim. Law, §§ 521, 547. It is unnecessary to say what would be our ruling had not the *nolle prosequi* been entered in the Morgan circuit court anterior to the trial.

In Texas, a trial upon a second indictment found against the defendant alone, has been held valid, where prior to that time a change of venue was had, the defendant being jointly indicted with another for the same offense and the change of venue taken at the instance of the co-defendant and over the objections of the party tried, and that indictment still pending. But that ruling was grounded in part upon the peculiar circumstances surrounding the case as presented by the record. *Cock v. State*, 8 Tex. App. 659. That case has obviously no relevancy here, and we need neither approve nor disapprove it.

Nor can it be said that the ruling of the lower court asserts the doctrine that a party defendant may be deprived of the right of a change of venue at the "mere caprice of the prosecuting attorney." If the original cause for the change of venue still existed, it was still as competent for the defendant to insist upon a change of venue as it was at first. But it was certainly not competent for him, after the Morgan circuit court had lost all jurisdiction, to reinvest that court with jurisdiction by a motion to that effect. This would be violative of statutory provisions respecting a change of venue, and place that change at the mere caprice of the party indicted. But in this case there was no cause for the change, and none is alleged. The original cause, the "prejudice of the judge" of the Henry circuit court, had ceased, and that judge was no longer judge of that court. This, we believe, was conceded to be the case

at the hearing, and if not so conceded, we could take judicial notice of who was the former and who was the present judge of that court, it being a court of general jurisdiction. 1 Greenleaf Ev., § 6. Had the original cause for the change of venue still existed; had the judge against whom the former application was filed still remained on the bench, the claim that defendant was entitled to have the cause removed from Henry county would possess more force and be entitled to greater consideration, but even then defendant could with no plausibility insist that the cause should be awarded to the Morgan circuit court simply because the cause had once been transferred there.

### III.

The next point for consideration is, whether the confessions of defendant were properly admitted. He was arrested at Sedalia on the 4th day of December, 1868, by the sheriff of Pettis county, to whom he was pointed out by one of a party of citizens who started in pursuit of the murderer of a man named Clark, found dead on the prairie near Leesville, in Henry county. Defendant had taken a wagon to a blacksmith shop, and returning to the livery stable with the team, he was arrested. Upon his arrest he made inquiry of the sheriff for what he was arrested, and on being told that it was for murder committed near Leesville, he said: "I have not been out with a wagon, but my partner has." Asked where he had been, he could give no account only that he was "out in the country around;" and made a similar reply in response to a question where he had been on a certain night. He said, if taken to the hotel where he had stopped, he would point out the name of his "partner." He had registered his name as John W. Patterson, and pointed out a name just beneath his own as the one he had promised to designate. He was afterwards left by the sheriff at the mayor's office during the rest of the day, and at night under the charge of the pursuing party. There, being asked if he had any money or papers,

he pulled out a pocket book and said: "There is the pocket book my partner gave me; I don't know what is in it." The pocket book was found to contain about $400. He was then searched to see if he had any money or papers sewed up in his clothes. After this search was over, or while it was going on, one of the party told the defendant he had "better tell the straight truth ; that it was not worth while to tell any falsehoods about it; that he might just as well tell the exact truth." The defendant then said: "Boys, I might just as well tell the whole truth. I was out there with the wagon. It was my partner that done the killing. I tried to get him not to do it, but I could not do anything with him ; and after it was done I was badly scared and did not know what to do."

During the stay in Sedalia something was said about a mob, but nothing, it seems, in the defendant's presence or hearing. At night, while he was being guarded at the mayor's office—after his statement as to the killing—several men came up stairs and knocked at the door—and one got on the roof and looked through the skylight—and upon being asked who were there, made no reply, but went off, and the persons guarding defendant said they would shoot the first man that attempted to come through the door; and defendant thereupon remarked: "Boys, my hair stood on end. If it had not been for you they would have mobbed me !"

The next day, accompanied by the sheriff of Pettis county, the arresting party took the prisoner to Henry county before a magistrate, who committed him to jail. On the way there, and when something like fifteen miles from Sedalia, near Flat Creek, and while the prisoner and Hornbeck were riding along together, the prisoner, his hands being free, but his feet tied under the horse, which Hornbeck was leading, the rest of the party not being within hearing, the prisoner fell into a conversation with Hornbeck and commenced speaking again about " his partner," when Hornbeck observed: " It is no use for you to

deny this, it is too plain a case." The prisoner then said: "I have been trying to pray all day, and it is not worth while for a man to try to pray with a lie in his mouth." He then proceeded to confess that he had no partner; that a man named Clark had been east, and was on his way back; had met him in Sedalia; was hired by him to haul a load of lumber south; saw Clark with money in his possession, determined "to get it in some way;" made up his mind to get the money when they camped on Tebo; but Clark, being sick, went up to Bradley's house near by; that he told Clark he was lonesome, in order to induce him to come back and sit with him, intending to kill him and throw his body into the creek; that Clark promised to come back and did so, but the murderous design was frustrated by another wagon driving into camp; for Clark remarking there was company for him, returned to the house and stayed all night; that the next day, after they started, Clark took a chill, fell asleep, and while asleep, he knocked him in the head with a hatchet, striking him several blows; took him by the hair of the head, bent his head back and chopped his throat with the hatchet. Being asked by Hornbeck why he "butchered the man up so," he said: "I wanted to make a sure thing of it." The prisoner further stated that he would have given the whole world if he had not made the first lick, but "concluded to finish it right;" that he took Clark's money, $400, drove out on the prairie, threw him out and left him there; drove on south of Grand river to the little town of Brownington, where the Sedalia and Osceola road crosses that stream; unloaded his load of lumber there, and returned to Sedalia. Asked by Hornbeck if not afraid to come right back, he said: "No, he thought that was the best plan—that nobody would ever suspect him." After this confession was made, Hornbeck called the others of the party, stopped them, related what the prisoner had confessed, and the latter said it was correct. The testimony is express and positive that neither in Sedalia nor on the way to the commit-

ting magistrate, were any inducements, either favorable or threatening, held out to the prisoner in order to obtain a confession from him.

There is no branch of the law of evidence in such inextricable confusion as that relative to confessions. Cases there are in abundance, where in one instance a confession has been held clearly admissible, where a confession in like circumstances in all substantial particulars, has been held clearly inadmissible. The conflict of authority is absolutely irreconcilable. We, therefore, shall be content with citing some of the authorities and stating our reasons for holding the confession, the details of which have already been given, as admissible.

Greenleaf, to whose work we are cited, states : " Before any confession can be received in evidence in a criminal case, it must be shown that it was voluntary." 1 Greenleaf Ev., § 219. This assertion in all its broadness is not supported by the authorities. Wharton lays down the rule quite differently : " In order to exclude evidence of a prisoner's confession, it must appear affirmatively that some inducement to confess was held out to him, by or in the presence of some one having authority." 1 Am. Crim. Law, § 698. Roscoe is thought to state the rule more accurately. He says : "For the purpose of introducing a confession, it is unnecessary in general, to negative any promise or inducement, unless there is good reason to suspect that something of the kind has taken place." Roscoe Crim. Ev., 54; 1 Ib., 40; *Rex v. Clewes*, 4 C. & P. 221; Whart. Crim. Ev., § 689; 6 St. Tr. 807; *Reg. v. Garner*, 1 Den. C. C. 329; *Reg. v. Williams*, 3 Russ. on Crimes, 432. In the case last cited Taunton, J., said : "A confession is presumed to be voluntary unless the contrary is shown, and as no threat or promise is proved to have been made by the constables, it is not to be presumed." In that case the one of *Rex v. Swatkins*, 4 C. & P. 548, was commented on, but there there were suspicious circumstances attend-

ing the confession which brought it within the rule announced by Roscoe.

In the case at bar, as already seen, express denial was made of any inducement being held out to the prisoner. This denial would, however, avail nothing if, in introducing evidence of the confession it appeared that inducements were really, though unintentionally, held out. *Com. v. Taylor*, 5 Cush. 605. Does the evidence, then, touching the confession and the surrounding circumstances bear about them indications of such influences that the law will not sanction? In short, is there ground for belief that the prisoner has falsely accused himself as guilty of a capital crime? If these questions be answered in the negative, the confession was receivable. It belongs alone, as was decided at an early day in this State, to the judicial province to determine as a preliminary question whether a confession was made with that degree of freedom which ought to occasion its admission as evidence. *Hector v. State*, 2 Mo. 166. This is the general doctrine. 1 Whart. Crim. Law, § 698, and cases cited; 1 Glf. Ev., § 219, and cases cited; 1 Chitty Crim. Law, § 570. And unless there was manifest error in admitting the confession, its being admitted should not cause a reversal of the judgment. *Fife v. Com.*, 29 Pa. St. 429.

We, however, in the exercise of our revisory functions, discover no error whatever on this point by the trial court. The law is settled now that a confession to be inadmissible must be made to an officer of the law, in consequence of improper influences exerted by him, and if no threat of harm or promise of worldly advantage be made by such official, or by the master of the accused when directly concerned, the confession is admissible. 1 Am. Crim. Law, §§ 686, 692, and cases cited; Whart. Crim. Ev., § 651. In the first instance, when the prisoner was searched in the mayor's office and told he had "better tell the straight truth," it does not appear that the sheriff was present; it would seem that he was not. But even if he was, it is difficult to see how these

words from one not in authority, could be regarded by the accused in the light of either a promise of benefit or a threat of injury. And a mere adjuration to speak the truth does not vitiate the confession, no threats or promises being employed. Whart. Crim. Ev., § 647, and cases cited. But no confession was made in Sedalia, and none until the next day when, perhaps, in another county, and when the party of citizens had shown themselves the previous night ready and willing to protect the prisoner from any supposed attempt at violence. In a case which arose in Alabama, a confession was held admissible, notwithstanding that on the day before the prisoner, when confined, was actually threatened by third persons with violence. *Mose v. State,* 36 Ala. 211. Here the visit at night by third persons to the mayor's office may have resulted from a mere idle or impertinent curiosity. At any rate, we are not disposed to regard any apprehensions which may have arisen to the prisoner's mind as still continuing at the time he confessed.

Nor does it matter that the feet of the prisoner were tied at the time. *Franklin v. State,* 28 Ala. 9. Nor can the words of Hornbeck, when conversing with the prisoner, be held, as calculated to excite either hope or fear of either temporal benefit or injury. *State v. Grant,* 22 Me. 171. They amount to neither promise nor threat. So that even should Hornbeck be regarded as a person in authority, this fact should not exclude the confession. In *Hawkins v. The State,* 7 Mo. 190, the sheriff observed to the prisoner that "It would be better in the long run to tell the truth about the matter, and not any lies," but gave no reason why it would be better, and the confession made to a third person in the presence of the officer and occurring a few minutes thereafter, was held admissible. So in *Fouts v. The State,* 8 Ohio St. 98, where the accused, being placed in custody, was told by his custodian: "If he was guilty it would not put him in any worse condition, and he had better tell the truth at all times;" and held no ground for excluding

the confession. So, also, in New Hampshire, where the magistrate urged the prisoner to make his statement of his whereabouts on the day before, expeditiously, and told him also : "You had better tell the truth;" the confession was admitted because there were "no promises of favor, and no circumstances of intimidation."

The general tendency of modern adjudication is to disregard any objection as to the admissibility of a confession not based upon a threat or promise made or sanctioned by a person in authority. Whart. Crim. Ev., § 651. Several of the earlier cases in England which went to an extreme in rejecting confessions, have been overruled. In *Reg. v. Baldry*, 12 Eng. Law & Eq. 590, Park, Baron, observed : "I cannot look at some of the decisions without some shame, when I consider what objections have prevailed to prevent the reception of confessions in evidence; and I agree with the observation    *    *    that the rule has been extended quite too far, and that justice and common sense have too frequently been sacrificed at the shrine of mercy."

For the reasons aforesaid, the confession in the case at bar must be held properly admitted.

## IV.

We pass now to the consideration of the proof of the *corpus delicti*. It is claimed that the allegation that James G. Clark is dead, has not been proven. The confession to Hornbeck does not show what was the christian name of the Clark who was killed. The defendant, however, when told by the sheriff in Illinois that he was arrested for the murder of James G. Clark, in Missouri, in 1868, said "Gentlemen, I am your man. I did it, and the people there know it, and there is no use denying it." But this express admission that the name of the murdered man was James G. Clark, and the confession to Hornbeck that "Clark" was murdered by defendant, would not be sufficient, if standing alone, to fasten the murder charged in the indictment upon him. For in the United States the generally current doc-

trine, a doctrine best accordant with humanity, is that an extra-judicial confession, uncorroborated, is insufficient for a conviction. 1 Glf. Ev., § 217, and cases cited; *State v. German*, 54 Mo. 526.

Let us see then what corroboration of the confession, if any, is afforded by the other testimony in the case. Anderson testified: In the spring of 1868, a man named James G. Clark, aged about thirty to thirty-five years, and having no family, moved to St. Clair county, a few miles from Roscoe. He bought a piece of land of Anderson. In the fall he left, saying to Anderson that he was going to St. Louis to procure money to pay for the land, but he never returned or paid for the land. The testimony of Roberts, hotel keeper at Osceola, is to the effect that one James G. Clark, between thirty and thirty-five years old, came to his house in 1867, and stopped there frequently and was frequently away; that he had bought a piece of land in the western part of the county and was there occasionally; that in the fall of 1868 he left Roberts' house to go to St. Louis and never returned. Cory testified that in July, 1868, he lived a few miles from Roscoe; that he became acquainted with one James G. Clark, who looked to be thirty-five to forty years old, and who had bought a piece of land near him and was improving it; that in the latter part of November, 1868, he went away, to be temporarily absent, but never returned. Elliston testified that in the spring of 1867, he was living near Roscoe in St. Clair county, and knew a man there named James G. Clark.

In December, 1868, a man named Clark, apparently about thirty years of age, stopped and stayed all night with one Bradley, who lived near a creek named Tebo, where the Sedalia and Carthage road crosses that stream. Clark had a young man, quite young looking, twenty-one to twenty-three years old, hauling lumber for him, who came up to get feed and camped on the creek some 300 yards distant. After Clark ate his supper, he went toward the creek, was gone about fifteen minutes, and then re-

turned; Clark was in poor health, said he was chilling; on the day next after the day Clark stopped with Bradley, the latter saw the corpse of Clark at Pretty Bob church; Bradley was with the party that went to Sedalia, identified the young man who was with Clark and camped near his house, and the young man said in Sedalia that his name was John W. Patterson. Bradley also recognized defendant as the same man.

On the 1st day of December, 1868, about ten o'clock a. m., Hudson, when going north toward Sedalia, saw a young man, (who afterward told him in Sedalia his name was John W. Patterson,) at the crossing of Pretty Bob creek, where the Sedalia and Osceola road crosses that creek, one and a half miles south of Cole's station, near where Hudson lived. The young man was driving a covered wagon with a stiff tongue and loaded with lumber, and when witness saw him was squatted down, washing his hands, while his horses were standing in the creek drinking. On seeing Hudson the young man jumped up, turned his team around and looked at Hudson over his left shoulder. Hudson noticed when he crossed the creek that the last wagon that crossed the creek was a broad tired wagon. Something like a quarter of a mile from that point he observed that the broad tired wagon had come into the road on his left; this was on the open prairie and he could see the track plainly. Going further he saw where the same wagon had left the road, the two points being distant some 300 yards, and he continued to notice the wagon track until he reached home. On returning home the night of the 2nd day of December, he was informed that a dead man had been found out on the prairie; went out there next morning, saw the body, went to the wagon tracks he had seen on the prairie and from there went to where the man was lying, and followed them until they went into the road again, at which point it was some 300 yards from the body, and some 250 yards from the road out on the prairie. The head of the corpse was broken and the skull mashed

as if with some hard and dull instrument, as an ax or hatchet, and the throat was cut apparently with some similar instrument. Some 150 yards south of the body a wheat sack and mackinaw blanket were found, both bloody, and on the sack was branded "Hezekiah W. Patterson, Alba, Jasper county, Missouri," in letters about an inch long. A letter containing a similar address had been deposited at the post-office at Cole's station the day before the inquest was held, and the evidence shows that Hezekiah W. Patterson lived in Jasper county, Missouri, and the defendant had been there and was his son.

It appears further that the road from Sedalia to Roscoe passes through the little town of Brownington; that in November or December, 1868, late in the day, a young man, apparently eighteen to twenty-one years of age, came to that place, driving a broad-tired covered wagon loaded with lumber; he was traveling south; said he was from Sedalia with a load of lumber; this he, unloaded; stayed all night; the next morning he left, stating he was going back to Sedalia, and went back with the wagon and team in that direction. The next day after he left, it being rumored that a man had been killed on the prairie, the lumber being examined "blood and plenty of it," was found thereon. In August, 1880, the young man was picked out by Avery from among three prisoners as the one seen by him at Brownington.

On the 2nd day of December, 1868, Hill, who lived in one mile of Pretty Bob creek and one and a quarter mile from where the dead body was found on the prairie, when hauling saw-logs in the forenoon, three miles south of Cole's station, saw a heavy two-horse covered wagon on the Sedalia road headed north. The driver of this wagon left his team, ran down the hill some 150 yards, and picked up something; went back to his wagon, crawled in and drove on. Hill was with the arresting party when one John W. Patterson was captured at Sedalia; and Patterson, after his arrest, being asked by Hill what it was he

had picked up, said it was a sheep skin that belonged to his father. Hill recognized the wagon in Sedalia; it was covered, had a broad tire, stiff tongue; in the wagon was a hatchet with some blood on it, and there was blood also on the wagon bed. Pursuit being made after the murderer, a party of citizens followed the track of a broad-tired wagon from where the body was found, on toward Sedalia, having learned that a wagon of a certain description had returned in that direction. Hudson, who was one of the pursuing party, and had seen John W. Patterson at the crossing of Pretty Bob creek, also recognized the wagon at Sedalia as the one he had seen at the creek; saw sprinkles of blood on the inside of the cover, and Patterson told him he remembered, when at the creek, seeing a man cross the creek with a span of black mules—the kind of team Hudson drove that day.

When we contrast, when we place in juxtaposition, the facts detailed in the confession of the defendant, with those established *aliunde*, there is no room to doubt that there is a strong, indeed a very remarkable coincidence between those confessed and those otherwise proven. These coincidences, above detailed, are so apparent as to need no pointing out. It would seem beyond the range of all reasonable hypothesis that the allegations of facts made in a confession, should so closely correspond in their general features, and in many of their minute details with those established by outside testimony, and yet the self-accusing confessor be held guiltless of the crime whereof he is charged. It is unnecessary that the *corpus delicti* be established by direct and positive testimony; that, in addition to the confession, the dead body be positively and directly identified as that of the person charged in the indictment to have been murdered. It is sufficient, in addition to the extra-judicial confessions, which in this instance in express terms admit all that the indictment charges, that there be such extrinsic corroborative circumstances, as will, taken in connection with the confession, produce conviction of

the defendant's guilt in the minds of the jury. It has often been ruled by this court that confessions uncorroborated by circumstances are insufficient. *Robinson v. State,* 12 Mo. 592; *State v. Scott,* 39 Mo. 424; *State v. German,* 54 Mo. 526. This is equivalent to asserting their sufficiency when meeting with the necessary corroboration. But such suppletory evidence need not be conclusive in its character. When a confession is made, and the circumstances therein related correspond in some points with those proven to have existed, this may be evidence sufficient to satisfy a jury in rendering a verdict asserting the guilt of the accused. "Full proof of the body of the crime, the *corpus delicti,* independently of the confession, is not required by any of the cases; and in many of them slight corroborating facts were held sufficient." *People v. Badgley,* 16 Wend. 53; *People v. Hennessey,* 15 Wend. 147. and cases cited; *Bergen v. People,* 17 Ill. 426; *State v. Lamb,* 28 Mo. 218; *Daniel v. State,* 63 Ga. 339; *People v. Rulloff,* 3 Parker Cr. R. 401. It may be safely affirmed that rarely, if ever, in the annals of criminal jurisprudence, has a case been found where the confession of a prisoner has been so thoroughly supported and corroborated in essential points as in the present instance.

## V.

So far as concerns the instructions, it suffices to say that the first in behalf of the State correctly defines the offense of which the defendant was convicted; and it is impossible that the others likewise given for the State, though incorrect, could have operated prejudicially to the defendant, and an instruction touching any degree of homicide other than murder in the first degree, would have been unwarranted by the evidence. *State v. Hopper,* 71 Mo. 425; *State v. Talbott, ante,* p. 347.

## VI.

As to the admission of testimony respecting the letter

put in the post-office at Cole's station, there would seem to exist good reasons for its admissibility. It was addressed to the defendant's father; that address corresponded with that on the sack near the scene of the murder, and the office where the letter was deposited was on the road traversed by the defendant in coming from and returning to Sedalia. The question was not what were the contents of the letter, but the fact whether such a letter had been mailed at the locality mentioned.

## VII.

Relative to the other testimony concerning the lumber, trunk and other articles said to belong to the deceased, it is enough to say that the evidence otherwise so clearly establishes defendant's guilt that evidence of such a nature could not have changed the result. *Rex v. Ball*, 1 Russ. & Ry. 132.

It only remains, therefore, to say that the sentence pronounced by the circuit court must be carried into execution. All concur.