Mr. Justice Shepard
delivered the opinion of the court:
The appellants, George Hardy and Edward Norris, were indicted, together with one William Gant, in the Supreme Court of the District of Columbia, for the murder of Peter H. Young on July 22, 1892. Trial was had June 15, 1893, resulting in the acquittal of Gant, and the finding of Hardy and Norris guilty of murder as charged. Motion for new trial was overruled and the death sentence pronounced against Hardy and Norris and ordered to be carried into execution, January 12, 1894, whereupon they prosecuted this appeal. On the argument reference was made to testimony claimed to have been introduced on the trial, but our consideration must be limited to that only which is contained in the bill of exceptions.
From this, from which we shall quote freely, it appears that the United States offered evidence “tending to prove that one Peter H. Young was on the 22d day of July, 1892, and prior'thereto, a merchant doing business at the corner of Fourth and D streets southeast, in the city of Washington, in the District of Columbia; that said Young was about forty-five years of age, and that his left hand was disabled by partial amputation; that on the night of said 22d day of July said Young left his place of business at about half-past nine o’clock, taking with him a small satchel containing money, receipts from his business; that he walked north to Pennsylvania avenue, then west along said avenue to Third street, then north on Third street toward East Capitol street, on which street was his home, and that when on said Third street, near East Capitol street, he was faced by two men, who stepped from an open space adjoining the street, and that one of said men struck said Young upon the head with *37 the handle of a pick, knocking him insensible upon the pavement, when both of said men ran away, taking the satchel containing the money; that the said Young did not recover consciousness, but died from the effects of said blow in about fifteen minutes.
“ And the United States gave further evidence, by an eyewitness of said occurrence, that the prisoners, Hardy and Norris, were the two persons who so intercepted said Young, and said witness identified the prisoner Hardy as the man who struck said Young, and the prisoner Norris as the man who stood by him at the moment of the killing; and gave further testimony tending to prove that a few minutes before said Young left his store on said night the prisoner Hardy went into said store and saw said Young counting his money, and made some remark to him about the same; that he then went from said store and sat upon the water plug, on the corner near by, and that when said Young passed up said Pennsylvania avenue toward Third street as aforesaid he was followed by the prisoners, Hardy and Norris, who passed rapidly in front of him and went up Third street in advance of him; and also gave evidence tending to prove that the pick handle with which said Young was killed was stolen a few days before the murder from a certain Simon Carmody, from his premises, at the comer of North Carolina avenue and Third street southeast; and also offered evidence tending to prove that the prisoner Norris was arrested on the night of the 23d day of July, 1892, by police officers Kraemer and McKie, and that .said Norris then denied all knowledge of said murder; that about two days afterward said Kraemer had a further conversation with the prisoner Norris, who was crying, and was told by him'that if he would arrest Hardy he (Hardy) could tell the officer something about it; that said Hardy was arrested on July 26th, about ten o’clock at night, and he denied to the officers that he had anything to do with the murder of said Young.”
1. The first assignment of error is based upon the following exception:
*38 “A witness on behalf of the United States, one James S. Kraemer, being asked if said Hardy afterwards made a further statement to him, the justice presiding, at the request of the counsel for the defendants, permitted them to interrupt the direct examination by the United 'States attorney and to enquire of said Kraemer touching the treatment given said Hardy before the time of said statement. Said witness, being asked if said Hardy was put in a dungeon at the station-house, and if he (the witness) did not beat said Hardy, on the night of his arrest, with a black-jack or a club, answered that he did not beat said Hardy at any time, and he did not think he was put in a dungeon that night; that if he was put in a dungeon at all it was not by witness, and that he did not see him in a dungeon and did not know that he was in a dungeon; whereupon counsel for the defendants asked the witness the further question—
“'Did you not testify in the police court that the boys were put in a dungeon? ’ ”
The District Attorney objected to further answer by the witness, and was sustained by the court.
The testimony was entered into at this stage of the case to enable the court to pass upon the competency of the prisoner’s confessions as evidence.
As we have said in the case of Brady v. United States, 1 App. D. C., 246, “The sufficiency of the evidence to show the competency of the confession is primarily a question for the court. As to how he shall satisfy himself with respect to this question, or as to what extent he will hear proof thereon, is necessarily a matter almost entirely within his discretion, the exercise of which should not be revised except in case of palpable abuse.”
It was within the sound discretion of the trial justice to permit, or to refuse to permit, the witness to answer the question, and we cannot see that there was any abuse thereof, or that the defendants could have sustained any injury thereby. It appears elsewhere in the bill of exceptions that there was no dungeon in the station-house where the pris *39 oners were confined at the time, and that no attempt was made by violence or abuse to force a confession from Hardy.
Under the circumstances, it is plain that the officer, if required to answer, would necessarily have denied making such statement in the police court. To follow up the point, then, defendants would have been compelled to call witnesses to contradict him thereon. This would have led the court away into a collateral inquiry, not justified by its materiality to the case. It was doubtless for these reasons that the learned justice who presided at the trial declined to go further into the matter.
2. The important question in the case is on the admissibility of the confessions of the two prisoners, which, together with the circumstances under which they were made, are set out fully in the bill of exceptions. After what has been stated above, the District Attorney asked Kraemer the following question:
“ ‘ Did you offer Hardy any inducement to make any confession or malee any threats to him? ’ He answered—
“‘We told Hardy if he did not hit the blow or snatch the satchel we would see what we could do for him — if he could give us any information about the case we would see what we could do for him? ”
Objection having been made and overruled, the witness testified that “ said Hardy then said that he did not strike the blow which killed Young, nor snatch the satchel; and, being asked who did, he answered, after hesitating that one Waters ' struck the blow and one William Gant (jointly indicted with said defendant) snatched the satchel, and that he (Hardy) and Norris were with them; that he stood on the corner of Third and A streets and saw the killing; that Gant asked for a match, and Waters struck the blow and Gant snatched the satchel.
“ And the United States gave further evidence tending to show that after the said conversation and statement by the said Hardy, said Hardy and Norris were locked in different cells in the station-house, and that another prisoner asked *40 said Hardy who killed the man, and said Hardy answered that he (Hardy) killed him; and being asked what he killed him for, answered, ‘ I killed him for his damned money,’ and then said that one of them went up on one side of said Young and he (Hardy) went on the other side, and one of them asked the man for a match, and while he was getting the match they hit him; that thereupon said fellow-prisoner asked the prisoner Norris if what Hardy said about it was true, and Norris said yes.
“ And the United States further gave evidence tending to prove .that said Hardy was overheard by two police officers to say to Norris in said cell, ‘Don’t tell him that I struck the blow; say it was Waters, and that Gant snatched the satchel, and we will both get one dollar and a quarter,’ and that said Norris agreed so to do, and that later in the same day said Hardy was taken by Officers Dyer, Kraemer and Acton into the presence of their superior officer, the lieutenant of police, who told him that his conversation with Norris had been overheard, and that he wanted him to make a truthful statement of the whole matter, and not to implicate any person who ought not to be implicated, and that he held out to him no inducement of any kind nor made to him any threats, but that the statement thereupon made was voluntary; that thereupon said Hardy stated that the prisoner Gant on the night before the murder of said Young had told him (Hardy) to see Norris and get him to go with him on the next night to rob Mr. Young; that on the next night, the night on which the murder occurred, they were to go to Mr. Young’s store and wait there until he came out and follow him until he got to a dark place, and then hit him and get the satchel and run; that on the said night he (Hardy) met Norris by agreement; that he went into said Young’s store, bought a package of cigarettes, and saw Young putting the money into the satchel; that he came out and sat on the fire-plug on the corner in front of the store and waited there until Mr. Young closed his store and started up Fourth street; that he and Norris followed Young to Third street; then went ahead of *41 him up Third street and into a vacant lot to wait for him; that when said Young got opposite where they were they went out to him; that Norris asked him for a match, and while Mr. Young gave a match he (Hardy) struck him in the stomach with a pick handle, and as Young bent over he knocked him on the head, when Norris grabbed the satchel and ran away; that they divided the money, he (Hardy) getting ten dollars, and, further, that he (Hardy) stole the pick handle with which said murder was committed from a yard at the corner of North Carolina avenue and Third street southeast, and that no other persons were present at the murder.
“And the Government gave evidence further tending to prove that immediately after said conversation between said lieutenant of police and said Hardy the prisoner Norris, being called into the presence of said lieutenant of police and asked what his knowledge of said murder was, corroborated said Hardy’s statement in every particular, excepting only the statement that he (Norris) snatched the satchel or was close by said Hardy when Young was killed, but said that he (Norris) stopped at the corner of Third and A streets and saw the blow struck by Hardy and Gant snatched the satchel, and that he and the others ran together. Said confessions so made to said lieutenant were made on the 29th of July, 1892.
“ And the United States further gave evidence tending to prove that on July 31st, at said station-house, in the presence of several witnesses and their co-defendant William Gant, said defendants repeated their former statements and confessed that it was said Hardy who killed said Young, and the said Norris was with him at the time of said killing, and that said killing was done in pursuance of a previous plan arranged between said prisoners and the prisoner Gant, and said Norris claimed to have received but thirty-five cents as the proceeds of the robbery, saying that when he found that the man was dead he did not want the money.
“ And the United States further gave evidence tending to *42 prove that said statements were made voluntarily and without threats or promise of any kind made to the prisoners by any person; that they were told before making said confessions that they must tell only the truth, and that if they intended to lie they should say nothing; and gave further evidence tending to prove that there is no dungeon at said station-house and none of said prisoners were at any time put in a dungeon; that there is an isolated cell in which noisy prisoners are sometimes placed, but the same is well lighted and as comfortable as any cell, and, further, that said prisoners or either of them was not beaten nor struck nor in anywise tortured or abused at any time prior to' said confessions.”
It appears from the foregoing recital that the statement made by Hardy in response to the remark of the officer, Kraemer, differs greatly with the subsequent more complete statements which are corroborated by the testimony of eyewitnesses and independent circumstances. This statement was intended to mislead and to conceal his active participation in the act of killing. It is not contended that this is the confession upon which, or by the aid of which, the conviction was obtained. The District Attorney claims that it was offered in connection with the later and important confessions, because, being more favorable to the defendants than they were, it was proper that everything he said should be given to the jury, though the later ones were not made in such connection with the former as to show that they were influenced by the remark of Kraemer, even if that were an improper inducement.
On behalf of appellants it is contended that the statement of Kraemer was an important inducement, the effect of which continued unremoved to the time of the later confessions relied on as evidence of guilt, and was the moving cause thereof.
Edward Norris, on his own behalf as a witness, said that he was not present when the murder was done, and had no part in it, and that his confession of guilt was extorted by *43 means of threats and ill-usage on the part of the officers who held him in custody. Hardy did not testify, and there was no other evidence offered by defendants touching the manner in which the confessions had been obtained.
The bill of exceptions shows that the statement of Kraemer, objected to as an inducement, was made to Hardy alone. It does not appear that it was made to Norris at any time, and therefore could have had no influence upon him. Any inference to the contrary, based upon the possibility of its influence through communication to him by Hardy, is precluded by his own testimony attributing his confession solely to threats and fear of violence; whereas the statement of Kraemer, if an inducement at all, could only have operated upon the hopes of Hardy, to whom it was made, by creating the possible expectation that he might escape punishment by becoming an informer. This statement, we think, effectually disposes of the objections to the competency of Norris’ confessions. The only remaining grounds of objection, that these were obtained by artifice, and by setting another prisoner, as it would seem (though not so proved), as a detective upon him, and then by confronting him with evidence so obtained and bidding, him to tell the truth, are not sufficient. With scarce an exception, the authorities all hold that confessions obtained by adjurations to speak the truth or by artifice and fraud are always competent evidence.
3. The competency of Hardy’s confessions remains to be considered.
It will be observed that Kraemer’s statement to Hardy was not general, to the effect that if he confessed they would see .what they could do for him, or that it would be better for him, or would go easier with him, and the like. Statements similar to these made by an officer to a prisoner in his charge, though not specific promises of anything, have generally been held to render the confessions following thereon inadmissible, because of the supposed mental condition of one held in prison, upon a serious charge, and the probable *44 bias that might be given by even a vague suggestion of hope coming from such source.
The statement of Kraemer was expressly conditioned upon the fact that Hardy neither struck the blow nor snatched the satchel.
This was almost as direct as to have said to him that if he either struck the blow or snatched the satchel from the falling man, nothing he could say could do him any good. It seems that Hardy so understood it, because the statement that he made under its immediate influence was a confession of his remote connection only with the crime, and a charge that his co-defendant, Gant, and another person struck the blow and seized the satchel. Later, he was overheard to caution Norris not to say that he (Hardy) struck the blow; but that Waters did it and Gant snatched the satchel. It would appear that he deliberately took the chances of escape, not knowing that there were eye-witnesses to his guilt, by attempting to fasten the act of killing upon Waters and Gant.
When the subsequent, and more nearly true, statement of Hardy was made, several days had intervened, and he had been told that his conversations with Norris and with the other prisoner had been overheard. No promises were then made him, no threats were used and no violence offered. He was simply asked to tell the truth and implicate no innocent person.
Even if the statement made by Kraemer previously, contained such a promise or expectation of hope, as would render a confession made in response to it inadmissible, it does not necessarily follow that it had any effect whatever in producing the subsequent and real confession of guilt. The two statements made by the prisoner are- entirely different. Several days of confinement had intervened, during which he had been separated from his co-defendants. He was informed that his conversations with fellow-prisoners had been overheard, and he was not aware whether or not Norris and Gant had made confessions.
The witnesses were before the court trying the case, to *45 gether with all the circumstances surrounding the parties and the transactions, and it must be made reasonably plain to us that error was committed to the probable prejudice of the prisoners before its judgment can be reversed. This is a general rule, the reason of which applies with special force to this case, for, in addition to their confessions, it appears that there was other direct and strong evidence of the appellants’ guilt.
The record shows, too, that the court gave plain instructions to the jury, at the instance of defendants, to disregard the confessions entirely if they had any reasonable doubt as to their having been voluntarily made.
He further told them that confessions should be scrutinized with caution, because of liability to abuse or misrepresentation when repeated by witnesses thereto; and that their value depends upon their being “deliberate, voluntary and free from inducements of rewards, or influence of fear or threats.”
After hearing the evidence upon the question of admissibility, the court held merely that the circumstances under which the confessions had been made were such as to make it his duty to submit them to the jury, to whom he left the question of their consideration, as well as their weight and credibility, under instructions most favorable to the prisoners.
The reported cases in which the competency of the confés-sions of prisoners, as evidence against them, has been discussed in England and the several States of our Union are so numerous and so variant that it would be an unprofitable as well as an almost, endless task to attempt their review and differentiation. All, professedly, agree upon the abstract proposition that no confession by a prisoner is admissible where it has been made under the influence of any promise or threat of a temporal nature, having reference to the charge against him made by a person in authority. But in the application of the principle to the facts of the particular cases there has been so much conflict and confusion that we seem *46 very far. from the establishment of a certain rule by which all cases may be determined, even if this be possible.
This goes to demonstrate the necessity of giving much latitude to the discretion of the trial judge and the propriety of the rule that his action will not be disturbed except in case of manifest error.
This is evidently the view of the Supreme Court, as appears in Hopt v. Utah, 110 U. S., 574, where it is said: “The admissibility of such evidence so largely depends upon the special circumstances connected with the confession that it is difficult, if not impossible, to formulate a rule that will comprehend all cases. As the question is necessarily addressed, in the first instance, to the judge, and since his discretion must be controlled by all the attendant circumstances, the courts have wisely forborne to mark with absolute precision the limits of admission and exclusion.”
Some of the inconsistencies in the reported cases proceed apparently from a misunderstanding, if we may so call it, of the reason .upon which the rule is founded.
To some extent the admission of confessions as evidence of guilt is regarded with extreme jealousy, because under systems of jurisprudence, prevailing at times in other lands, confessions have been obtained by cruel treatment and even torture. In the land of the common law, prejudice seems also to have existed against them, because they have been supposed by some to encourage official oppression into invading the private rights of those who must be presumed innocent until proven guilty, and who cannot be made to criminate themselves. Such reasons, if they ever had any foundation anywhere, can have little or no application in the United States.
The real reason why, at common law in earlier days, confessions were not favored, is that they were considered unreliable, because in some instances, under slight influences and inducements, prisoners had been known to make confessions of guilt, though really innocent. Hence it has been said that “ The true point of consideration is, whether the prisoner *47 has falsely declared himself guilty.” Commonwealth v. Dillon, 4 Dall., 117.
An examination of all the cases, we think, will show clearly that the rule rejecting confessions at all, when obtained by those in authority over accused persons, had its origin, not in consideration of any private right or privilege of the person that is violated, but solely in the belief that it was unsafe to rely upon them as evidence of guilt. This explains why it is that courts which have carried the rule of exclusion of confessions, as has been said, “to the verge of common sense,” have, at the same time, with great unanimity, upheld the admissibility of confessions into which prisoners had been entrapped by artifices and frauds, sometimes most shameful in practice. Another reason for requiring that there should be no question'with respect to the freedom of the confessions from improper influences, had its foundation in the rule, then generally prevailing and still existing in many jurisdictions, which was that the action of the court was final, in so far as the competency of the confession is concerned; and that the jury were bound to consider it when admitted and could only pass upon its weight as evidence. The better rule now generally prevailing is to limit the power of the court to the question of the admissibility primarily, only, leaving the jury perfectly free to consider or to reject it, according as they might believe it to have been properly or improperly induced. That is the practice which we approved in Brady v. United States, supra, and which was pursued by the trial justice in this case, as we have seen, with great fairness and liberality to the accused.
According to the current of early authority in England, which has influenced the opinions of many of the American-courts, the evidence of Hardy’s confessions may not be competent. It must be remembered, however, that the large majority of these cases were tried by single judges holding the courts of assize, and their rulings are accounted for by Parke, Baron, as follows: “We all know how it occurred. Every judge decided for himself upon the admissibility of *48 the confession, and he did not like to press against the prisoner, and took a merciful view of it” Reg. v. Baldry, 2 Den. C. C., 430. This case was tried on appeal and the question was argued with ability by counsel and fully discussed by the judges, who delivered separate opinions concurring in the announcement of a doctrine which has greatly modified that of the older cases. In his opinion, Parke, B., said: “Justice and common sense have too frequently been sacrificed at the shrine of mercy.” Erie, J., said: “I am of opinion that when a confession is well proved it is the best evidence that can be produced; and that unless it be clear that there was either a threat or a promise to induce it, it ought not to be excluded. According to my judgment, in many cases where confessions have been excluded, justice and common sense have been too frequently sacrificed, not at the shrine of mercy, but at the shrine of guilt.” Lord Campbell said: “ If the matter were res integra I should, perhaps, have doubted whether it might not have been advisable to allow the confession to be given in evidence and let the jury give what weight to it they pleased.”
Confessions are not to be excluded because not spontaneous. They would rarely, if ever, be made without the operation of some influence upon the mind of the prisoner. A mere hope, produced chiefly by the prisoner’s own imagination, or by his conception of the necessities of his situation, or a fear produced by the fact that he has been charged with a serious crime, for the first time in his life, perhaps, arrested and lodged by himself in a close cell, are not sufficient to require the exclusion of confessions made under their several influences. It is only where the confession may be said to have been extorted, that is to say dragged reluctantly from the breast of the prisoner, through the deliberate excitation of his hopes or fears by some actual promise or threat, that the court should refuse to let it go to the jury for any purpose.
In all other cases it should be given to the jury, as was done in this instance, with the instruction that it is their duty *49 to reject it altogether if they should have a reasonable doubt as to its voluntary nature. This practice commends itself to’ us as just to society and neither unfair nor inhumane to the prisoner.
For the reasons given in the beginning of this opinion we have not attempted to review and criticize or explain the many cases in which this vexed question has been discussed, yet it may not be unprofitable to mention some well-considered cases which, we think, will be found to have analogy, in a degree not remote, to the case at bar and to that extent to support the views herein expressed. See Rex v. Reason, 12 Cox C. C., 228 ; Rex v. Jones, Id., 241; Rex v. Arnold, 8 C. & P., 622 ; State v. Patterson, 73 Mo., 695 ; State v. Hopkirk, 84 Mo., 278 ; Commonw. v. Preece, 140 Mass., 226 ; Commonw. v. Mitchell, 117 Mass., 431 ; Fife v. Commonw., 29 Pa. St., 429 ; Wentz v. People, 37 N. Y., 303 ; People v. McGloin, 91 N. Y., 241 ; State v. Tatro, 50 Vt., 483; Meinaka v. State, 55 Ala., 42 ; State v. Fortner, 43 Iowa, 494.
The fact that by the judgment in this case the prisoners have been condemned to suffer the penalty of death, has caused us to give the record and the arguments of counsel, which have been able and earnest,» the most careful inquiry and consideration. The result has been to satisfy! us that the trial in the court below was fair and impartial, and that no error can be found therein which would excuse, much less justify, the reversal of the judgment.

The judgment must, therefore, be affirmed, and it is so ordered.