THE STATE v. ANDERSON *et al., Appellants.*

1. **Criminal Practice: MURDER.** The conviction of murder in the second degree, under an indictment for murder in the first degree, constitutes no bar under the present constitution to a trial and conviction of murder in the first degree after the conviction of murder in the second degree has been set aside and a new trial awarded.

2. ——— : ———. The evidence, on the trial of this case, resulting in conviction of the defendants of murder in the first degree, examined and held to abundantly support the verdict of the jury.

3. ——— : INSTRUCTION. The judgment of conviction in such case will not be set aside because of an objectionable instruction where it appears that such instruction did defendants no harm.

The State v. Anderson.

4. **Murder : CONSPIRACY : INDICTMENT.** It is not necessary to charge a conspiracy in an indictment for murder in the first degree in order to convict those charged therewith with the joint commission of the crime,

5. —— : —— : ——. Where two persons are jointly indicted for murder in the first degree,..the one for doing the murderous act and the other for aiding, abetting, and assisting therein, both are principals, and the conviction of the principal actor is not a condition precedent to the conviction of the accessory, and *vice versa;* for the act of the one is the act of the other.

6. —— : —— : ——. The indictment in such case may either allege the matter according to the fact, or charge them both as principals in the first degree.

*Appeal from Carroll Circuit Court.*—HON. J. M. DAVIS, Judge.

AFFIRMED.

*J. W. Sebree* and *L. H. Waters* for appellants.

(1) The defendants having been acquitted of murder in the first degree in this case, on a former trial, the conviction for murder in the first degree at the last trial was wrong, unless there is some provision in the constitution changing the law on that subject. *State v. Ross,* 29 Mo. 32. The present constitution provides : " Nor shall any person, after being once acquitted by a jury, be again, for the same offence, put in jeopardy of life or liberty ; but * * * if judgment on a verdict of guilty be reversed for error in law, nothing herein contained shall prevent a new trial * * * according to correct principles of law." Const., art. 2, sec. 23. The constitution does not pretend to declare what those "correct principles of law" may be, but means that the error committed at the former trial shall be corrected, or that the trial shall be according to the law of the land. The laws of this state, in force before the adoption of the present constitution, and still in force, expressly pro-

vides that " when a defendant shall be acquitted upon
any indictment, he shall not thereafter be tried or con-
victed of a different degree of the same offence." *State
v. Bruffey*, 75 Mo. 392 ; R. S. 1879, sec. 1656. And he
may plead such acquittal in bar to any subsequent accu-
sation. R. S. 1879, sec. 1658. The laws of this state, in
force since long before the adoption of our constitution,
provides that where judgment shall be arrested the de-
fendant may be again tried for the same offence, and
such has been the uniform practice in this state. R. S.
1879, sec. 1657. The constitution made no change in the
rule where judgment shall be arrested, nor has it pro-
vided for the trial of a defendant after he has been
acquitted. This case was reversed "for error in law."
Under the provision of the constitution defendants could
again be tried according to correct principles of law.
What "those principles of law" are, the constitution
does not pretend to say. (2) When circumstances of
deliberation and malice are not proved, the law will only
presume a homicide to be murder in the second degree.
*State v. Eaton*, 75 Mo. 586. The evidence in this case
utterly failed to show deliberation and malice. Rea
was killed at or in the door of Baugh's cabin after he
had literally cut Baugh all to pieces. We must look to
the facts and circumstances of the killing itself, to de-
termine the grade of the offence, and if that is done in
this case, no one can say the defendants are guilty of
murder in the first degree. (3) The court should have
given an instruction as to each grade of homicide to
which any of the evidence might apply, and of which
defendants might be convicted. *State v. Branstetter*, 65
Mo. 155 ; *State v. Edwards*, 70 Mo. 480 ; *State v. Robin-
son*, 73 Mo. 306 ; *State v. Wieners*, 66 Mo. 20. If Rea
was killed in "heat of passion" upon any sudden or
sufficient provocation ; if unnecessarily killed while re-
sisting an attempt to commit a felony, or to do some

other unlawful act after such attempt had failed, then the killing was manslaughter, and an instruction defining that offence should have been given, 3 Cooley's Bl. Com. 191; *State v. Holmes*, 54 Mo. 165; Whar. on Hom. 398; *State v. Starr*, 38 Mo. 277, and cases cited; R. S., sec. 1243. Rea and Baugh were unfriendly. Rea went to the cabin where defendants were. Immediately after the shooting Baugh was found dangerously cut in his side, and severely cut on the shoulder. No attempt was made to show that these wounds were self-inflicted. The surgeon who dressed them testified that it was physically impossible that Baugh should have thus wounded himself. There was a conflict beyond any doubt, and in that conflict Rea was killed by Anderson, and Anderson's hand was cut by Rea. The injuries were inflicted on Baugh before Rea was shot. Mrs. Singleton swears that the fatal shot was the second shot fired. 1 East P. C., 232-235; Whar. on Hom., sec. 5; 2 Bishop's Crim. Law, secs. 676, 697. If the killing was wilful, but without premeditation or deliberation, then it was manslaughter, and on that question the jury was not allowed to pass. *State v. Edwards*, 70 Mo. 480; *State v. Burgess*, 78 Mo. 234. (4) The court erred in refusing to allow defendants to contradict Snowy Singleton. (5) The court erred in giving the seventh, eighth, ninth and tenth instructions asked by the state, and should not have modified defendant's fifth instruction. (6) The tenth instruction asked by defendant should have been given; there was no conspiracy charged or proved. (7) The conviction of Baugh of any grade of homicide was not authorized by the evidence.

*B. G. Boone*, Attorney General, for the state.

(1) The indictment is properly drawn. Both defendants are charged as principals in making the assault. Anderson as the immediate perpetrator of the crime,

and Baugh as present aiding and abetting. Both are principals, and the law imputes the injury given by one as the act of the other. R. S., sec. 1649 ; *State v. Dalton,* 27 Mo. 13 ; *State v. Ross,* 29 Mo. 32; *State v. Davis,* 29 Mo. 391 ; *Stipp v. State,* 11 Ind. 62 ; *People v. Woody,* 45 Cal. 289 ; *State v. Anthony,* 1 McCord, 285 ; Whar. on Hom. [2 Ed.] secs. 333-334 ; 1 Hale's P. C. [Am. Ed.] sec. 438. Besides, this indictment has heretofore been held sufficient by this court. *State v. Anderson,* 86 Mo. 309. (2) Although defendant was convicted of murder in the second degree at the first trial, this constitutes no bar to his trial and conviction of murder in the first degree after reversal of the first judgment by this court. Const. of Mo., sec. 23, art. 2 ; *State v. Simms,* 71 Mo. 538. (3) The action of the trial court was proper in excluding the testimony of one Moore as to remarks made by a Mrs. Singleton. The incompetency of the evidence is apparent without the citation of authorities. Defendants saved no other exceptions to the admission or rejection of evidence, and they cannot now be heard to complain. *State v. Ray,* 53 Mo. 345; *State v. Pints,* 64 Mo. 318 ; *State v. Williams,* 77 Mo. 310. (4) The first instruction given by the court is the formal and usual declaration of law as to murder in the first degree. *Green v. State,* 13 Mo. 382 : *State v. Jennings,* 18 Mo. 435 ; *State v. Ross,* 24 Mo. 483 ; *State v. Hollenscheit,* 61 Mo. 302; *State v. Foster,* 61 Mo. 549 ; *State v. Thomas,* 78 Mo. 327. The second instruction properly defines the law as to murder in the second degree. *State v. Underwood,* 57 Mo. 40 ; s. c., 64 Mo. 319 ; *State v. Peak,* 85 Mo. 190. The third instruction told the jury if they believed defendants guilty of either degree of murder, but entertained a doubt as to the degree, they should give defendants the benefit of such doubt, and find them guilty of the lesser degree. The evidence in this case might properly have been applied to murder in

either degree. *State v. Lane*, 64 Mo. 319, and cases cited. The degree was a question for the jury to determine from all the evidence. *State v. Foster*, 61 Mo. 549. The fourth instruction told the jury that if they believed, from all the evidence, that Anderson was guilty of either degree of murder, as defined, and entertained a reasonable doubt as to Baugh's guilt, that they might convict Anderson and acquit Baugh. This was correct. 2 Bish. Crim. Proc. [3 Ed.] sec. 7, and authorities cited; *State v. Hollenscheit*, 61 Mo. 308; *State v. Miller*, 70 Mo. 604; *State v. Anderson*, 86 Mo. 309. The fifth instruction properly defines the technical words constituting the elements of the crime charged. *State v. Weiners*, 66 Mo. 13; *State v. Banks*, 73 Mo. 592; *State v. Kotovsky*, 74 Mo. 247; *State v. Snell*, 78 Mo. 240. The sixth instruction has been repeatedly approved by this court from 1857. *State v. Nueslein*, 25 Mo. 111; *State v. Anderson*, 86 Mo. 309. The seventh instruction in regard to self-defence has, under a similar state of facts, uniformly been approved by this court. *State v. Starr*, 38 Mo. 270; *State v. Linney*, 52 Mo. 40; *State v. Underwood*, 57 Mo. 50; *State v. Eaton*, 75 Mo. 586; *State v. Thomas*, 78 Mo. 339, 340; *State v. Jones*, 78 Mo. 285. The eighth instruction in regard to statements made by defendants since the fatal shooting is correct. *State v. Carlisle*, 57 Mo. 102; *State v. Hill*, 65 Mo. 84; *State v. Vansant*, 80 Mo. 71. The ninth instruction in regard to the statements or admissions of one defendant since the fatal shooting, not binding or affecting the other, is correct. *State v. Daubert*, 42 Mo. 239; *State v. Duncan*, 64 Mo. 262; *State v. Reed*, 86 Mo. 194. The tenth instruction as to the credibility of witnesses, their demeanor on the stand, etc., has repeatedly received the approval of this court. *State v. Thomas*, 78 Mo. 341; *State v. Vansant*, 80 Mo. 71. These were all the instructions given by the court at the instance of the state. (4) The court then

gave nine instructions at the instance of the defendant after modifying the fifth. The modification consisted in striking out the words "prior to or," in the last line before the word "since." The instruction, if given as asked, would have excluded all evidence as to what Baugh said or did prior or since the killing of Rea. The tenth instruction asked by defendant was properly refused. The defendants were jointly indicted and tried for killing Rea, and under the circumstances the instruction was misleading and improper. (5) The evidence clearly showed that the defendants were either guilty of murder in the first or second degree, or that the killing was justifiable. Under this state of facts the trial court was not authorized to give an instruction for manslaughter in any degree. *State v. Kilgore*, 70 Mo. 547 ; *State v. Ellis*, 74 Mo. 207 ; *State v. Johnson*, 76 Mo. 121 ; *State v. Snell*, 78 Mo. 240 ; *State v. Jones*, 79 Mo. 441 ; *State v. Ramsey*, 82 Mo. 133. (6) The complaint made by defendants, in the motion for a new trial, that the officer in charge of the jury twice left them after they were placed in his custody, without leaving any one in charge of them, cannot be considered. The error complained of is not a matter of exception, arising in the progress of the trial, and to entitle it to the consideration of this court, it should have been supported by affidavit. *State v. McLaughlin*, 27 Mo. 111 ; *State v. Ray*, 53 Mo. 345 ; *State v. Fritterer*, 65 Mo. 422 ; *State v. Stark*, 72 Mo. 46.

*Peak & Yeager* also for the state.

(1) The action of the trial court in excluding the testimony of Moore as to remarks made by Mrs. Singleton, was clearly proper. A witness cannot be interrogated as to immaterial matters for the purpose of contradiction and impeachment. *Harper v. Ry.*, 47 Mo. 567 ; *Lohart v. Buchannan*, 50 Mo. 201 ; *McKern v.*

*Culvert*, 59 Mo. 243.    (2) The trial court's modification of defendant's instruction was proper.    (3) The tenth instruction asked by the defendant was properly refused.    (4) The former conviction of murder in the second degree constitutes no bar to a trial and conviction of murder in the first degree after the first judgment is set aside by the Supreme Court.  *State v. Simms*, 71 Mo. 538; *State v. Kring*, 11 Mo. App. 100; s. c., 74 Mo. 631; s. c., 107 U. S. 221.

SHERWOOD, J.—The defendants were indicted for the murder of John Rea, the indictment charging Anderson as the principal, and Baugh as accessory.  The crime was charged to have been committed by shooting with a shot gun; and on being tried they were convicted of murder in the first degree, and sentenced accordingly.  At a former trial they were convicted of murder in the second degree, but on appeal that judgment was reversed because of the absence of certain instructions, which there is every reason to believe the trial court gave, but which were not incorporated in the bill of exceptions.  The cause is again here on appeal, counsel for defendants assigning several errors; errors relating to the grade of the crime of which the defendants were convicted; the failure of the evidence to show deliberation and malice; the giving of improper instructions on behalf of the state; the failure to properly instruct the jury on behalf of the defendants; the failure to admit proper testimony offered by defendants, and the failure of the evidence to show that Baugh was guilty of any grade of homicide.

I.   The constitutional point raised by counsel for defendants, that, having been found guilty of murder in the second degree, thereby they go forever acquit of murder in the first degree, and cannot again be tried therefor, has been otherwise ruled in *State v. Simms*, 71 Mo.

II.   The evidence in the cause, briefly told, is this :. About six o'clock on the evening of April 8, 1884, the reports of three shots were heard to proceed from, or in the immediate vicinity of, Baugh's cabin ; the second shot, the loudest, and from a gun, the blaze from which came from the cabin door, was seen by Mrs. Singleton, whose house was something like one hundred yards from Baugh's cabin, in a south or southeast direction ; and as the second shot was fired she saw Rea, who had gone in the direction of the cabin about two minutes before, stoop or fall, and then defendants run out of the cabin, Anderson out by the cellar in front of the cabin door, and Baugh around the cabin, and when she turned from her door, where she had gone on the report of the first shot, and went back into the hall, she heard the third shot.   Her husband's testimony is of similar import.   He saw Rea leave witness's house, start in direction of Baugh's cabin, and in about two minutes thereafter heard two shots in quick succession, the second the louder, whereupon he ran around his house and toward Baugh's cabin, and when he had gone some thirty or forty steps in that direction, he saw Baugh run around the cabin, and Anderson in front of the door, then heard the third shot after Baugh ran around the cabin ; and on arriving at the cabin he saw Anderson, and then saw Baugh come around the cabin, and in his hand was a pistol which he laid down with both hands on a bench by the side of the house.   He found Rea lying on his left side near the door dead, with his left arm extended, holding his hat in his left hand, his right arm over his body, his clothing on his right breast a-fire, and a wound on his left shoulder.

Upon Singleton's asking who killed Rea, Anderson said :  " We did it—I did it."   Said that Rea had tried to break the door open, and then shot at Baugh twice, then came at him ; that Rea jerked the pistol out of Baugh's hands ; then shot at him twice ; that he cut Baugh and

came at him ; that Anderson said nothing about being cut nor did witness see any blood, cuts, or wounds on either of them, but Baugh, after he had left the cabin, and was going past the mill, some one hundred and sixty to one hundred and eighty yards away, and walking rapidly, said he was cut too bad to get away. Singleton. did not know whether a large pocket knife was there when he first went to the cabin or not ; that the shot-gun was lying on the bed ; that nothing unusual appeared in the cabin, which was about twelve by fourteen feet, and contained a bed, table and stove ; that Anderson left first and Baugh a minute afterwards ; that they left about two minutes after witness got there ; that witness ran over to the mill, and on his return found Moore, who had meanwhile come, putting out the fire which was burning the clothing on Rea's breast. Other testimony .in the cause corroborated the testimony of Singleton and wife as to the number of shots fired, and as to the rapidity and nature of the reports.

When Dr. Grant, the coroner, arrived at Baugh's cabin, about eleven o'clock the same evening, he found a large pocket knife, half open, lying on the door step ; this had no blood stains on it, and when handed by the coroner to Snider, who was also present, *tobacco crumbs fell out of it.* No weapon, knife, or pistol, was found in Rea's hands, or on his person, and a wound was found in the left shoulder, back of the top of the shoulder, about the size of the bottom of a tea cup, which penetrated downwards and inwards, and the shot taken from it was about the size of a turkey shot, and the indications were that when shot he was stooping forward, facing the man who shot him, who was above him. Rea had no coat on, and his clothing on his right breast had been burned, and there was a burn on that breast, and one of the witnesses states that there was a wound on that breast, as well as a bruise about an inch and a half long. The bed in the

cabin was out in the floor, on blocks; dishes, lamp, and a bucket of water were on the table, and no indications of any disturbance were found about the room, nor any marks or stains about the house, and Baugh's shot gun was found on the bed in the cabin with one barrel discharged, and his revolver, with three chambers empty, was found on a box on the east side of the cabin. The only door in the cabin was on the west side; it opened on the inside on the right as you came in, was about four and a half feet high; was reached by a step about sixteen inches in height, and from the top of the door a strip had been freshly sawed the width of the door, and about one-fourth of an inch wide, the saw-dust yet remaining on the step; a piece of the chinking had been knocked out in the southwest corner of the cabin, and from this opening a man could be seen coming from Singleton's house. Tracks, thirty or forty in number, apparently made by Rea as he came from the direction of Singleton's house, were plainly visible in the sand where his body lay, some two feet from the door, and they stopped at the body, and there were marks in the sand made by Rea's heels as he turned and fell.

This is the testimony of a witness who went to the cabin only four or five minutes after the shooting occurred. The knife found on the door step was proven to have been borrowed by Rea, the day before he was killed, from Hill, with whom he was at work, in order to fix his harness. Rea had formerly lived with Baugh, and after a difference and law-suit had occurred between them, had moved over to Singleton's, leaving a bed-stead and mattress at Baugh's. Threats frequently made by Baugh towards Rea's life, in case he came to the cabin again, were testified to, some of them occurring but a few days before the homicide. Threats also on the part of Rea towards Baugh, made some month or more before the fatal occurrence, were proven, but were not so pronounced in their nature as those of Baugh. It was also

in evidence that Rea, on the morning of the eighth of April, went over to Baugh's cabin. What then occurred between Baugh and the deceased is not known, but at a subsequent period Baugh made a statement to Mr. Jewell, editor of the *Democrat*, that Rea had been to his house that day, and said he was coming back that evening after his bedstead.

The evidence further discloses that Anderson and Baugh are cousins, Anderson living two miles from Baugh's; that Baugh went in the morning of the eighth of April to Anderson's house; went away and returned again, and remained there from about noon till about four P. M. Anderson was having the chills, had one that day and was covered up in bed. It was a cold, blustering, raw afternoon, the wind was blowing quite hard, a sudden cold north wind having sprung up about 3:30, when Anderson got out of bed and accompanied Baugh to his cabin. They had arrived there by five P. M., for Mrs. Singleton says they passed her house that afternoon, and Murphy says they passed his house about four o'clock that afternoon going towards the mill, and Trotter passed within three feet of the corner of the cabin on his return from Cary's, and when he did so he saw the door closed, and heard the voice of Baugh and some one else inside, his attention being attracted thereto by hearing "*the door creak;*" and in about two minutes thereafter, when he had gone his way, he heard the shots fired. There was evidence also that Baugh was seen just after the homicide, by one who met him about two hundred and fifty yards from his cabin, walking pretty fast; that he did not speak, and no blood or cuts were seen upon him. And it was shown in evidence that Anderson had subsequently admitted that Baugh, on the day of the killing, had told him there was to be a row or difficulty that night, or the next, and wanted him to go home with him; but he told Baugh he did not want

to go if there was to be a difficulty, but Baugh insisted and he went, as he wanted to see Marlow about some corn, and Thomas about hauling some wheat, and so he picked up his hat and went. This conversation was, however, denied both by Anderson and another who said he was present at the alleged time. This was the substance of the evidence in chief on the part of the prosecution, and of some of the evidence to the contrary.

On the part of the defence, Joel Anderson testified: "I am one of the defendants; was born in this county, and am fifty-three years old; never was away from the state except in time of the war. John Rea and I were friends, never had an unfriendly word; he had been at my house to borrow money within a week before he was killed; when he shot a negro I befriended him and kept him at my house nine weeks; I was having chills— had a chill every third day; had a chill April 8, 1884; when Baugh came to my house not one word was said about John Rea, or any difficulty between him and Baugh; or of any expected row or fuss; while Baugh was there I wanted to see Thomas about hauling some wheat, and Marlow about some corn, and went up with Baugh; on the way I saw Thomas about hauling the wheat; we passed near Singleton's house, and I spoke to her as we passed; we went along the road in sight of the men at the mill; we went to Baugh's cabin, and I felt so bad after the walk that I laid down; it was a blustery April day; the wind was blowing quite hard; the door of the cabin was shut most of the time; Baugh got a bite to eat; I drank a cup of tea and ate a little something and went back to bed; we went up about four P. M.; about dusk Rea came to the door and said, 'Hello, let me in.' Baugh said, 'Who is it?' Rea said, 'It is me, Laurel, I want to come in and put up my bed;' Baugh said, 'You can't do it, we have had trouble and we can't do it;' I told Baugh to open the door and let him in; as he opened the door Rea came with his knife and

struck at Baugh and cut him in the side; Baugh got his pistol and Rea still followed after him, cutting at him with the knife; Rea got hold of the pistol as Baugh started to go out of the door; he either ran out or Rea shoved him out, and both went out; Rea ran out to door of cave; Baugh ran around the house; Rea started back to door with knife in his right hand and pistol in his left; said he was going for me; as he started to come in the door he shot at me twice, and then came with the knife; I caught his right hand and shoved him back and reached for the shot gun, and just as he stooped as if to come under me I shot and killed him, and believe if I had not killed him he would have killed me; when I caught his hand he cut a gash in the palm of my left hand; when Singleton and Marlow got there I told Singleton that Rea had cut Baugh until I believed he had about killed him; I had no idea that there was going to be any trouble at Baugh's; I never told Graham at the time he speaks of, nor at any other time, one word about the case or the shooting; I saw Graham on the bank of the river when the ice was breaking; Wash. Hardin was with us all the time; I did not ask him if he didn't think there was a conspiracy to have a row at Baugh's that night; did not tell him that Baugh said he expected a difficulty that or the next night; the whole difficulty did not last more than a minute; Baugh came to the house the morning of April 8, went away, and came back again; I wanted to see Thomas about hauling some wheat, and Marlow about some corn, and Singleton about a cow and some corn, and I went away with Baugh; I saw Thomas on the bank of the river; passed in hailing distance of Marlow, but did not say anything to him; I passed in hailing distance of Singleton but did not say anything to him; we got to the cabin between four and five o'clock; I laid down on the bed; Baugh got a little bite to eat; I did not see any pistol or gun; did not know there was any in the house; think

the door was shut most of the time; do not know whether it was locked; about six o'clock Rea came to the door and hallooed, 'Hello;' Baugh said, 'Who is there?' Rea said, 'Me, Laurel;' Baugh said, 'What do you want?' Rea said, 'I want to come in and put up my bed and sleep here to-night;' Baugh said, 'John, we have had a difficulty about a law suit, and I don't want you to come in;' I said, 'Let him in, Laurel;' Baugh opened the door; Rea came in with knife in his hand and commenced cutting Baugh; Baugh seized a pistol and Rea grabbed it and took it from him as they passed out of the door; Baugh ran out to the cellar and fell and crawled under the fence and ran around the house; Rea then started toward me with pistol in left hand and knife in right hand, and said, 'Joel, I'll kill you too,' and shot at me; the ball passed through my hat; I was standing in door; the door was five feet high; I'm six feet, two inches; I was stooping down when Rea shot at me; he kept coming towards me and shot at me a second time; the ball passed through my clothes between body and arms; I grabbed his right hand and pushed him back, and reached up and got the gun and shot him, and when I shot Rea he was stooping to come in under me, and I reached back and up and got the gun and held it in my right hand and the butt under my right arm and cocked it with my right hand, and then shot while Rea was in the act of coming in under me, and he fell with his hands in the door."

And there was also evidence that on the evening in question, Anderson was seen going home from Baugh's cabin, with his hand bleeding and blood on the skirt of his coat, and that the cut was in the palm of his hand, and was dressed by a druggist the next morning. And there was evidence that the chinking had been knocked out and the strip sawed off the door several days prior to the eighth day of April; and evidence of the opinion

of a physician, that while it was possible for the defendant, Baugh, to have inflicted most of the knife wounds, some of them quite severe, found on him when he reached Murphy's on the night of the homicide, that it was "almost physically impossible" for him to have inflicted with his own hand the two greater wounds found on his shoulders.

The state, in rebuttal, showed that it was from six and a half to seven and a half feet from the edge of the door up to the breach of the gun when in the rack, and that upon a careful and thorough examination no bullet holes were found in the roof of the cabin, and when examined, log by log, no bullet holes were found in the cottonwood logs, of which the walls of the cabin were built.

The foregoing is a sufficient statement of the evidence, apart from the testimony of Singleton, taken on the preliminary hearing, which was introduced in order to contradict his testimony at the trial, and which it does in some particulars, but the effect of such contradictions are measurably, if not altogether, neutralized by the explanation of the witness that he wished to correct his testimony after it was read to him, but was told it made no difference. Whether this explanation was satisfactory was exclusively for the jury.

I have been thus particular in narrating the salient features of the evidence, *pro* and *con*, and of setting forth the evidence of Anderson in its entirety, because it is insisted that the evidence fails to show deliberation and malice, and because upon that evidence depends the propriety of giving several instructions on behalf of the state, and of the refusal to give others in regard to a lower grade of homicide than those given by the court. And I have been the more particular, also, because two human lives are being weighed in the scales of justice; and weighed against that evidence and all legitimate inferences therefrom.

So far as Baugh is concerned, the evidence unquestionably establishes that he bore malice toward the deceased; that he had repeatedly threatened that if he came again to the cabin, he would never get away alive; and it is shown that he expected him to return to the cabin for his bedstead on the fatal evening; and though there is conflict on the point, there is evidence of fresh preparations having been made to await the expected coming of Rea to the cabin; chinking is knocked out, and a strip sawed off the top of the door, so that the movements of Rea could have been readily watched as he approached the cabin on his expected errand. And it is a very significant fact that, but two minutes before the shooting, Trotter, when he passed by in three feet of the cabin, heard Baugh's voice inside talking to some one, and "*heard the door creak.*" Whether the shot gun and revolver were freshly loaded does not appear; but that they were ready for use is undisputed. In these circumstances, had Baugh alone been found at the cabin, and had been brought to trial, there would have been evidence amply sufficient to have convicted him of the highest grade of crime charged. But Anderson testifies, and if his testimony be true, Baugh, as well as himself, was guiltless of any offence. Taking Anderson's testimony by itself, and considering it without reference to anything else, it certainly makes out as clear and strong a case of self-defence on his own part, and of entire innocence on Baugh's part, as ever was found in the books. But, obviously enough, it would contravene all rules to direct attention to Anderson's testimony, and leave every other circumstance, and the testimony of every other witness out of view. As already shown, he is contradicted on the most essential points by both Singleton and his wife. If their testimony be true two pistol shots were not fired at him by Rea; if their testimony be true, from the shot gun proceeded the second shot, and this is shown by his own, as well as

by the testimony of every other witness, to have been the fatal one ; if their testimony be true, he and Baugh ran from the cabin at the same time, and this was after the second shot, after Rea fell, and before the third shot made its report. But aside from that, his testimony is contradicted as to his knowledge of an expected difficulty at Baugh's cabin, and, apart from such contradiction, it is hardly probable that he would leave his sick bed, and, without the promptings of some more urgent motive than he has suggested, would venture out on a raw and blustering day in the cold wind, such as he encountered, when he walked two miles with Baugh to the latter's cabin.

But if Rea, after the door was opened, had cut Baugh, taken his pistol from him, and returning from pursuing him, had fired two shots at Anderson at close range, as he stood stooping in the cabin door, one of which passed through his hat, and one through his clothes, how does it happen that in Rea's left hand is found his hat, and how does it happen that a diligent search made by two witnesses failed to discover any traces of the bullets thus fired? How does it happen, also, that in the alleged struggle in the small cabin, between Rea and Baugh, none of the furniture was disarranged, or overturned, and no blood stained the floor? But, more than all, what became of the pistol which Rea had in his left hand, and of the knife which he held in his right hand at the time he attacked Anderson and was shot dead in his tracks? These weapons were found neither in Rea's hands, nor on, nor near his person. That neither of defendants would have removed them, furnishing, as they would, such convincing proofs of the truth of Anderson's story, is attested by every consideration of the most obvious and the most powerful self-interest. As to the half-opened knife having been found on the door step, it may be disposed of by the remark that it bore upon it no blood stains, and that it had not

been used in the conflict, is shown by the tobacco crumbs. which fell out of it, when picked up by Dr. Grant and handed by him to Snider.

These physical facts are of such irresistible cogency, that testimony which attempts to overthrow them, must be baffled in the effort . As to the fact of Baugh having been wounded severely by Rea, it is a very pregnant circumstance that he made no complaint when Singleton and others reached the cabin, and this, it seems, he would instinctively have done, had the wounds, after- wards discovered, been then in existence. If these wounds on Baugh were inflicted at a period subsequent to the conflict; inflicted by his own hand or the hand of another, and there is ample room in the evidence for such an inference, that inference entirely legitimate as it is, is most damaging in its tendency, as showing that Baugh, in order to exonerate himself, and to support Anderson's story, had fabricated evidence with that exculpatory purpose in view. This is termed the forgery of real evi- dence. Best's Evid. [Chamberlayne's Ed.] 205, *et seq.;* and the maxim " *Omnia presumuntur contra spolia- torem* " applies. *Ib.* 397, 197, 117.

But notice further, Anderson came on the stand as a witness ; he testified to facts peculiarly within his own knowledge ; he knew how the clothing was burned, and the bruise and the wound inflicted on Rea's right breast, and yet he is wholly silent on the point. Why thus silent ? He testified to the bullet hole shot through his hat and to the one through his clothes, and yet neither hat nor clothes were produced on the trial, though they would have spoken most powerfully in this behalf. And while it is true that under the statute no comment or allusion can be made as to the failure of a defendant to testify in his own behalf, yet this statu- tory rule extends no further than the terms of the statute, so that when a defendant in a criminal cause takes the stand as a witness, and fails, as in this case, to

testify to, and to explain prominent and damaging facts, facts peculiarly within his own knowledge, the inferences from such failure are as adverse as though he were a witness as a party to the record in a civil cause; or being thus a party, fails to produce evidence confessedly under his control, and peculiarly within his own knowledge. Under a statute such as our own in regard to a defendant witness testifying, a similar ruling has been made. *Stover v. People*, 56 N. Y. 315; *People v. Ryland*, 97 *Ib.* 129; *Bradford v. People*, 20 Hun, 309. See, also, *State v. Emory*, 79 Mo. 461; *State v. Dickson*, 78 Mo. 438; *State v. Grant*, 76 Mo. 236; *State v. Hopkirk*, 84 Mo. 278; Best's Evid. [Chamberlayne's Ed.] 283. For these reasons I am of the opinion that there was abundant evidence of a very cogent nature upon which the jury found, as they did, against both of the defendants.

III. Now as to the instructions: Objection is taken to the seventh instruction on behalf of the state on the ground that there is no evidence whatever that the defendants brought on or voluntarily entered into the difficulty. On this matter it suffices to point to the evidence itself, and to all the legitimate inferences to be drawn therefrom. The form of the instruction is objectionable in that it does not use after the words "brought on the difficulty," the qualifying words "with the view to wreak their malice." I still entertain the views on this point which I took occasion to express in *State v. Culler*, 82 Mo. 623, and that view is amply supported by the authorities; I find none to the contrary. In addition to those there cited, see *King v. State*, 13 Tex. App. 277; *Stoffer v. State*, Harrigan & Thompson's Cases on Self-Defence, pp. 213, 227; *Adams case, Ib.* 208. But notwithstanding this, the omission of the words mentioned, or of equivalent words did no harm, since it is evident that if defendants brought on the difficulty they brought it on of their "*malice pre-*

*pense*," and, therefore, any question of a sudden quarrel, and of a hastily given blow, with no ulterior felonious purpose in view, does not arise in this case, because not presented by the record. As to the other instructions, the eighth for the state, on similar occasions, has received the frequent approval of this court and the like remark applies to the ninth and tenth instructions. This disposes of all the instructions given on behalf of the prosecution to which objection has been made.

IV. The failure of the court to give any instruction as to any lower grade of homicide, has already been touched upon. The evidence adduced, giving the greatest latitude of credibility to Anderson's testimony, and considering it apart from any other, made out a clear case of self-defence, and on this topic instructions were given. On the other hand, the other evidence in the cause powerfully tends to show a case of murder in the first degree, and on this, as well as murder in the second degree, appropriate instructions were given. On no other theories could the cause have been tried, and this was the view taken of the case when here on a former occasion. And, indeed, it may well be doubted, considering the intrinsic improbability of Anderson's story, contradicted as it was by the physical facts of the case, whether any instruction involving the question of self-defence should have been given. Neither courts nor juries should be required to base their action or belief on physical impossibilities. If this be the correct position, then the case, shorn of all its extraneous and irrelevant features, stands out upon the record, just as the verdict of the jury finds it to be, one of murder in the first degree, without a single palliating feature, and unredeemed by a single extenuating circumstance.

V. In regard to the instructions asked by defendants: There was no error in modifying the fifth asked on their behalf. The sixth instruction had told the jury

that in passing on the guilt of Anderson not to consider any evidence of any threats made by Baugh against the deceased, nor any evidence of any statements made by him concerning his relations with Rea, or the circumstances or manner in which he was killed. These instructions, taken together, were certainly as favorable as defendant Anderson could ask, and more than this it is unnecessary to say now. The tenth instruction was properly refused because the whole law of the case was covered by those given; properly refused because misleading, and if given might have led the jury to believe that it was necessary to charge a conspiracy in an indictment for murder in the first degree, in order to convict those charged therein with the joint commission of that crime. And the fourth instruction was far more favorable than defendants were entitled to. When two parties are jointly indicted for murder in the first degree, the one for doing the murderous act, and the other with aiding, abetting, assisting, etc., both are principals; the conviction of the principal actor is not a condition precedent to the conviction of the accessory, and *vice versa;* for the act of the one is the act of the other. 2 Bishop on Crim. Proc. [2 Ed.] sec. 3. And the indictment may either allege the matter according to the fact, or charge them both as principals in the first degree. *Ib.* And so is our statute. Secs. 1649, 1651; *State v. Phillips,* 24 Mo. 475; *State v. Ross,* 29 Mo. 32. I mention this lest it grow into a precedent.

VI. The only remaining point is the refusal of the court to permit Moore to contradict Mrs. Singleton as to whether she had said at her house on the morning of the homicide that there was "going to be some fun there that day." The proposed testimony had no possible bearing or relevancy, and was wholly immaterial. This is enough on the point.

After a very careful examination of the record I have been unable to discover any reversible error therein, and in my opinion the judgment should stand affirmed and the law take its course.    All concur.