State v. Goddard.

---

## THE STATE v. GODDARD, Appellant.

Division Two, April 23, 1901.

1. **Indictment: CHANGE OF VENUE: NOLLE: FURTHER PROSECUTION.** A dismissal or quashing of a first indictment is no bar to a second prosecution or a second indictment. Where defendant was indicted and was granted a change of venue to another county the entrance of a nolle prosequi there was no bar to a further indictment and prosecution in the county where the crime was committed.

2. ————: ————: ————: ————: CAPRICE OF PROSECUTING ATTORNEY. The sustaining of a second indictment and prosecution after a change of venue has been granted under the first and the State has entered a nolle prosequi, is not resting the right to a change of venue in the caprice of the prosecuting attorney.

3. **Murder: SECOND DEGREE: APPEAL: REVERSAL: NEW TRIAL.** Under the Constitution of 1875, a reversal, for errors of law, by the Supreme Court of a judgment convicting defendant of murder in the second degree, under an indictment charging murder in the first de-

gree, is not a bar to putting defendant on trial, under a second indictment, for murder in the first degree.

4. **Former Acquittal**: MATTER OF LAW: JURY.  Where no legal reason is disclosed in the plea of abatement and the motion for discharge, why the indictment should abate or the defendant be discharged, the record alone being introduced and the identity of the defendant and the offense being conceded, questions of law alone are presented for determination, and a failure to submit the question of his former acquittal to the jury, no request being made therefor, is not error.

5. **Murder**: EVIDENCE: GENERAL OBJECTION.  A general objection to any conversation with the daughter of the murdered man as hearsay, is not sufficient to convict the court of error for permitting the witness after having answered a dozen unobjectionable questions, to recite statements which revealed her guilty knowledge of the murder, no specific objections being made to such recital and no motion to exclude it.

6. ———: ———: OBJECTIONABLE MATTER DEVELOPED BY STATE: WAIVER.  Objections to recitals of a conversation with the daughter of the murdered person as being hearsay, are waived if the defendant in a subsequent examination of such daughter brings out evidence of the same character and significance—in this case, guilty knowledge of defendant's purpose to kill deceased.

7. ———: ———: CLOTHING OF DECEASED: IDENTITY.  A witness must of his own knowledge identify the hat and cuffs he saw in the parlor where the murder was committed as belonging to deceased, or else he is incompetent to testify about them.  A statement at the time by deceased's daughter to witness that they were her father's, is not such knowledge.

8. ———: ———: ESTRANGEMENTS: CAUSE.  Defendant stated there was an estrangement between him and deceased, and when asked what was the cause, the court remarked:  "I don't think you need go into the cause of it; the fact is what you want."  *Held*, in the absence of a further offer by defendant to show some particular reason for the estrangement, the exclusion was no ground for reversal.

9. ———: ———: DECEASED'S PHYSICAL CONDITION: APPREHENDED DANGER.  The evidence showed that deceased was a weak, frail man, weighing only about 120 pounds, and almost blind.  His daughter testified that about an hour before the shooting, he and defendant being then in a quarrel in the room where the killing occurred, she had taken a pistol from him, and defendant testified that he saw no

weapon in his hand when the final struggle began. *Held*, that it was no error to admit evidence of deceased's physical condition, as it was for the jury to determine whether the defendant had any reasonable cause to apprehend any great bodily harm from him.

10. ———: ———: CRIMINAL INTIMACY WITH DECEASED'S WIFE: ASSOCIATION AFTER HOMICIDE: IMPEACHMENT. The evidence showed that defendant had for some time been intimate with the wife of the man he killed, and at the trial numerous witnesses testified that they were seen after the homicide riding together in a suburban town. Defendant testified that he had never been in that town in his life, and she, that she had not seen or talked with him since the killing of her husband. *Held*, that the evidence that they were seen buggy-riding together was competent both as impeaching their testimony, and as corroborative of the State's evidence of their criminal intimacy prior to the homicide and of the motive for the homicide. Such evidence might have been received in chief, but it was also rebuttal.

11. ———: ———: INSTRUCTION: IMAGINARY CASE. An instruction predicated upon a state of facts foreign to the case, should be refused. A defendant is not pursuing his ordinary vocation in life when he goes to the private apartments of the wife and daughter of his adversary, on the ground, as he says, that he was called there by her, but waits in her parlor for more than an hour until her husband returns and when he has killed him calls at her room to inform her that he has done so.

12. ———: ———: ———: APPREHENSION. It is not error to fail to define the words "reasonable cause" in the instruction about apprehended danger.

13. **Change of Venue:** JURISDICTION OF JUDGE. The granting of a change of venue from the circuit where the indictment is found, completely severs all connection with the case of the regular judge of another circuit who has been called from his circuit to try the cause. And, if after such change of venue is granted, the case is nolled, and a new indictment found, the regular judge of the county is not required to call on the same regular judge to again try the cause, but can call on the regular judge of any other circuit.

14. ———: ———: RECEIVING INDICTMENT. A judge who is disqualified to try a cause, has authority to receive the indictment in his court, and of providing a judge to try the case.

15. ———: CONVICTED OF SECOND DEGREE MURDER: REVERSAL: MURDER IN FIRST DEGREE: CONSTITUTION. There is no violation of the four-

teenth amendment to the Constitution of the United States in the rule of the Supreme Court and in the provision of the Missouri Constitution, that one who has been indicted and tried for murder in the first degree and convicted of murder in the second degree, and on appeal to the Supreme Court the judgment is reversed and the cause remanded for new trial because of errors of law, may, when the case comes up for trial again, whether under the same or a new indictment, be tried for murder in the first degree.

Appeal from Cole Circuit Court.—*Hon. D. W. Shackleford,* Judge.

AFFIRMED.

*I. N. Watson, W. S. Pope, F. P. Walsh* and *F. E. Luckett* for appellant.

(1) On January 30, 1899, the State, over the objection and exception of defendant, dismissed said cause pending in Cass county, Missouri, and the judgment recited that he be discharged and that he go hence without day. This was a judgment discharging defendant from said cause, and he could plead same in bar of any other proceedings by the State. 1 Chitty's Crim. Law, 461; Rogers v. Gosnell, 51 Mo. 468. (2) It was the rule of law in this State, until the adoption of the present Constitution of the State of Missouri in 1875, that where a person was indicted for murder in the first degree and was put upon his trial and convicted of murder in the second degree, and new trial ordered at this instance, he could not legally be put upon his trial again upon the charge of murder in the first degree. State v. Ross, 29 Mo. 32. To the same effect see the following authorities: People v. Gilmore, 4 Cal. 376; State v. Hornsby, 5 La. Ann. 588; Slaughter v. State, 6 Humph. 413; Jones v. State, 13 Tex. 184; Hunt v. State, 25 Miss. 381; Bish. Com. Law, sec. 676; State v. Ball, 27 Mo. 327.

When defendant was tried for murder in the first degree and the jury found him guilty of murder in the second degree, that operated as an acquittal of murder in the first degree, and he can not, therefore, be prosecuted again for the same offense without violating the fourteenth amendment of the Constitution of the United States, which declares that no person shall be deprived of life, liberty or property, without due process of law. And the statute of the State of Missouri (section 2369, Revised Statutes 1899), expressly provides that, "Upon an indictment for an offense consisting of different degrees, as prescribed by this law, the jury may find the accused not guilty of the offense charged in the indictment, and may find him guilty of any degree of such offense inferior to that charged in the indictment," etc. This is an express legislative declaration that where a jury finds defendant guilty of a lesser degree of crime than charged in the indictment it acquits him of the higher crime charged, and he can not thereafter be prosecuted for the same offense without violating the fourteenth amendment of the Constitution of the United States, supra. In re Bennett, 84 Fed. Rep. 326. (3) But these proceedings also violate the latter clause of section 1, article 14, amendments to the Constitution of the United States, in this, it denies to defendant the equal protection of the laws of the State. Tinsley v. Anderson, 171 U. S. 43, L. C. Rep. 91; Ex parte Ulrich, 42 Fed. Rep. 597; Railroad v. Chicago, 166 U. S. 226; County of Santa Clara v. Railroad, 18 Fed. Rep. 385; Railroad v. Beckwith, 129 U. S. 26. (4) In overruling defendant's plea in abatement and motion to discharge him without submitting same to a jury, the court violated his right to trial by jury given by the Constitution of the State of Missouri, and thereby deprived him of his liberty without due process of law and the equal protection of the law guaranteed by article 14, amendment of the Constitution of the United States. (5)

Over defendant's objection and exception the State was permitted to prove by witness Seymour that he, with Marie Jackson, were in his room on the floor above the one in which the shooting occurred, and that when they heard the report of the shooting, Marie Jackson exclaimed, "Papa is shot." This was a statement of a third person not in the presence of defendant, and was the rankest hearsay testimony. State v. Brown, 64 Mo. 371. (6) The court erred in excluding the evidence of Gertrude Stewart to the effect she saw cuffs lying near Jackson's body when she went to the door of the room where the shooting occurred. No one was present in the room at time of shooting except defendant and deceased. This evidence corroborated defendant's evidence that there was a scuffle between him and Jackson, and Jackson had his cuffs jerked off in the struggle. (7) The court erred in admitting in rebuttal evidence tending to show that in the fall of 1898 defendant had met wife of deceased out near Rosedale, Kansas. This evidence was not legitimate rebuttal and tended to prove no legitimate issue in the case, and it is rank hearsay testimony. State v. Williams, 121 Mo. 399. (8) If we are wrong in our contention that the judgment dismissing said case in Cass county was a bar to any other proceeding, then Judge GEORGE F. LONGAN was judge of the criminal court of Jackson county, in this case, and the motion to call Judge LONGAN should have been sustained. If the judgment of the circuit court of Cass county "that defendant go hence without day" be deemed not final, the proceedings had in Jackson county under the second indictment could be nothing more than a continuation of the prosecution begun under the first indictment. There was no new cause of action against defendant set forth in the second indictment. The same *corpus delicti* was alleged, the crime was alleged to have been committed at the same time and by the same means, and the offense was identical. The decisions

are unanimous on the proposition that the trial under the second indictment must be had before the special judge selected to try defendant under the first indictment. Ex parte Clay, 98 Mo. 578; State v. Neiderer, 94 Mo. 79; State v. Hayes, 88 Mo. 344; State v. Sneed, 91 Mo. 552. This is because, as already suggested, where a cause is not dismissed the proceedings under the second indictment are but a continuation of the proceedings under the first. State v. Dougherty, 106 Mo. 187; Sharpe v. Johnson, 76 Mo. 660. The jurisdiction of Judge LONGAN over the cause was in no wise affected by the reversal of the judgment on the first appeal. State v. Sneed, 91 Mo. 552; State v. Hayes, 88 Mo. 344. And after the re-indictment in Jackson county, it was Judge LONGAN's duty to preside over the cause. Ex parte Clay, supra; State v. Neiderer, supra. When the jurisdiction of Judge LONGAN attached in 1897 it continued until the final determination of the cause between the State and defendant. State ex rel. v. Wear, 129 Mo, 627; State v. Noland, 111 Mo. 489; State v. Moberly, 121 Mo. 604; State v. Hayes, 81 Mo. 574; State v. Hayes, 88 Mo. 344; State v. Sneed, 91 Mo. 552; State v. Davidson, 69 Mo. 509; State ex rel. v. Wofford, 111 Mo. 532.

*Edward C. Crow,* Attorney-General, and *Sam B. Jeffries,* Assistant Attorney-General, for the State.

GANTT, J.—On the second day of April, 1897, at the Woodland Hotel in Kansas City, Jackson county, Missouri, Jefferson D. Goddard shot and killed Frederick J. Jackson. On the twentieth day of April, 1897, the grand jury of Jackson county returned an indictment charging Jefferson D. Goddard with murder in the first degree. After a mistrial defendant was, on a second trial in the Jackson County Criminal Court, before Honorable GEORGE F. LONGAN, special judge, convicted

of murder in the second degree, and his punishment fixed at imprisonment in the penitentiary for the term of sixteen years. On appeal to this court the judgment was reversed and case remanded (146 Mo. 177) and a change of venue was ordered to Cass county. Afterwards on the twenty-fourth day of January, 1899, the grand jury of Jackson county returned a second indictment against defendant for the same offense, again charging murder in the first degree, and the indictment pending in the circuit court of Cass county was nolled. Judge JOHN W. WOFFORD disqualified himself and called in Honorable DORSEY W. SHACKLEFORD, judge of the Fourteenth judicial circuit, to preside as special judge in the cause. Upon application of the defendant for a change of venue from Jackson county the same was granted and the case was sent to Cole county.

The transcript of the record from Jackson county, together with the various motions made by the defendant's counsel, was filed in the Cole Circuit Court April 20, 1899. On the eighth day of June, 1899, the trial began in the circuit court of Cole county. On the fourteenth day of June, 1899, the jury returned a verdict of guilty of murder in the second degree against the defendant, and assessed his punishment at twenty years in the penitentiary. After unsuccessful motions for a new trial and in arrest of judgment, defendant has again appealed to this court.

Frederick J. Jackson had lived in Kansas City for about twenty-two years. The record reveals a very pathetic story of how he had begun business in a small way, starting a laundry at 514 Independence avenue; living in rooms over it with his young and devoted wife; how they had struggled and worked together; he was a mechanical genius, studying, inventing and perfecting laundry machinery; she helping in extending the business, reading scientific papers to him, night after night, on account of his bad eye-sight; sometimes reading to him out of

these scientific and mechanical papers until one o'clock in the morning, papers in which she took no interest, devoting her life to him and her family, which as the years went by increased until there were four girls to bless their happy and prosperous home. As testified to by Dancy, a nephew of Mrs. Jackson, who had worked in the laundry for nine years, and had sustained intimate relations with the Jackson family, up to the time Goddard, the defendant, came between Fred Jackson and his wife, they were a friendly and happy family, as affectionate as could be. She would not eat her meals unless he was with her. It was in the language of George Jackson, a brother of the deceased, "a happy home in every respect."

Some time in the year 1892 or 1893, Mrs. Jackson's arm or wrist was injured in some way and the defendant, who had an office across the street from the laundry and the Jackson home, began to treat her; this was the beginning of what the evidence tends to show afterwards ripened into a criminal intimacy. The defendant spent a great deal of time in the company of Mrs. Jackson, sometimes in the Jackson home, sometimes in the drugstore of defendant, which was diagonally across Independence avenue, a few doors to the west of the laundry, and sometimes in the defendant's rooms over the drugstore. As time went on Mrs. Jackson secured the legal title to the business in her name, and some six months before the defendant killed Jackson, Mrs. Jackson and the girls removed to the Woodland Hotel on the corner of Eighth street and Woodland avenue. While at the hotel, Mrs. Jackson was sick, Goddard the defendant visited her every day and at all hours up to the fatal night of April 2.

The details of this intimacy from its beginning down to the death of Fred Jackson, and its continuance up to within two weeks of the last trial are narrated by a number of witnesses, showing the parties in many compromising situations. So open

and flagrant in the face of society were their relations as to cause a public scandal.

Elmer Phillips, a business man, whose store was located on the southwest corner of Locust street and Independence avenue, while the drugstore of defendant was on the southeast corner, had seen defendant Goddard ·and Mrs. Jackson together constantly, on the street, in the drugstore, over the laundry, and in Goddard's rooms over the drugstore, early and late.   He had seen them in Goddard's rooms, remaining there for a long time together, and having, afterwards, some six weeks or two months before the homicide, gone to Goddard's room and found Mrs. Jackson there with Goddard, he spoke to both of them about the matter, telling them what people were saying about them.

Mrs. Mary March saw them from her rooms over the grocery store across the street, many times, together in Goddard's rooms; several times in nearly a nude condition, saw them embracing and caressing each other.

Mrs. Reichel who had rooms over the front part of the drugstore tells of the relations between them, culminating in seeing them in the sexual act.

Frank Stewart, one of the defendant's witnesses, a resident of the Woodland Hotel, saw the defendant several times leaving the hotel as late as twelve and one o'clock at night.

Dr. Hetherington, who had boarded and roomed at the hotel during the time the Jacksons were there, and who had been called in consultation in Mrs. Jackson's sickness, testified to the same effect about seeing the defendant leaving the hotel at night.

Albert E. Reichel, husband of Mrs. Reichel, was a druggist who had been in the employ of defendant from the fifteenth of April, 1894, to the middle of August, 1895.   When he first went there Mrs. Jackson would come over once a week, then it was every day; and finally she would be over in the morning,

afternoon and at night. Reichel went to work about eight o'clock in the morning, and found her there with defendant very nearly every morning. Witness tells what he saw of the conduct between the defendant and Mrs. Jackson, which is in detail, in acts and words, the old story of guilty love and blind infatuation so plainly visible to all observers, from which but one deduction can be drawn, and but one end to be expected, a tragedy. On one occasion, defendant not feeling well, witness got to the store and opened up a little before seven o'clock. About seven Mrs. Jackson came over and asked for defendant, passed on up to his room and remained there until eleven o'clock.

David Eagan, a workman in the employ of the Metropolitan Street Railway Company, stationed at Eighth street and Woodland avenue, across the street from the Woodland Hotel, testifies that he saw Goddard frequently prior to the killing, coming and going every day, some times two or three times a day, supposed he was a guest of the hotel. On one occasion about three weeks before the killing, at nine o'clock in the morning, he noticed Goddard come out of the hotel and go out into the middle of the street and drop something in the cable slot. To satisfy his curiosity he and two other men got it out and found it was a freshly-used cundrum. Upon another occasion A. A. Pratt, who was a flagman in the employ of the Metropolitan Street Railway Company at the same corner, and had seen defendant come out of the hotel, quite often as early as seven o'clock in the morning, saw the same action on the part of defendant between seven and eight o'clock in the morning, and upon fishing out the article dropped in the slot found it to be a cundrum rolled up in a piece of paper, it seemed to be freshly used, and when arrested defendant was well supplied with these articles.

These relations appear to have been continued after

Jackson's death, though more secretly, notwithstanding the fact that defendant was still charged with the murder, and knew that the illicit relations between himself and the wife of his victim were held by the prosecution to furnish the motive for the killing.

W. J. Gates testified that on the twenty-eighth day of May, a little more than a week before the trial begun in Cole county, he saw defendant and Mrs. Jackson reclining upon the grass in a woods pasture on the outskirts of the city. When they saw him they got up and started away.

Dave Buckland, street commissioner, of Rosedale, Kansas, in the summer of 1898, saw defendant and Mrs. Jackson riding together in a buggy coming from the direction of Westport. Goddard got out of the buggy and went towards the electric car line from Kansas City to Rosedale. Late in September he saw defendant coming from the direction of the street car line and go towards Westport, walking slowly; directly Mrs. Jackson came along with her buggy, he got in the buggy, and they then drove away.

E. D. Powers, city marshal of Westport, had noticed the defendant a number of times going up the hill, and out of curiosity watched him until he got pretty near the top of the hill, when a lady came along with a phaeton and took him in. He identified a lady he saw as he came into the court room, as the lady he saw with defendant. George W. Bloy, of Rosedale, saw the same circumstance.

Mrs. Lou Moreland, a widow residing two miles and a half southwest of Rosedale, during April and May, and afterwards in 1898, saw defendant and a lady she afterwards recognized as Mrs. Jackson, as many as twenty times ride by her house together in a buggy, the lady always driving.

J. F. Kingley, a resident of Rosedale, saw defendant during the summer of 1898 a dozen times going up the hill from the

Vol 162 mo—14

street car towards Westport, and on one occasion saw him get in the buggy with Mrs. Jackson.

The defendant on the witness stand denied that he had ever been in Rosedale.

The defendant seems to have exercised a strong influence over Mrs. Jackson financially. He induced her to buy a half interest in a drugstore which he ran at a financial loss, and also appears to have sold her a farm in Kansas.

As an effect of Goddard's presence in the Jackson family upon the daughters of deceased, and of the poison which had been instilled in their minds against their father, a man against whom as a kind father no word or breath of wrong appears from the history of his life, as shown in the trial, the following from the cross-examination of Maud Jackson is most significant. She says that on a former trial before Judge LONGAN she was asked by the trial judge the question, "How do you feel towards your father?" She answered, "I didn't take on very much, so I guess I didn't care much about him." And the judge next asked, "You didn't care anything about his being killed?" and she answered, "I didn't like to see him killed that way, I would rather see him die a natural death."

These relations between the defendant and Mrs. Jackson, although for a long time they appeared to produce no effect upon Jackson, finally brought about an estrangement between Mr. and Mrs. Jackson.

Goddard, the defendant, in speaking of this, says there was never any unfriendliness up to the time Mr. Jackson and Maud went to New York, which was in the summer of 1896, coming back in September, a month before they moved to the Woodland Hotel, "it accrued about the time they moved to the Woodland Hotel, I did not meet him any more except on one occasion, and he did not meet me after they moved to the Woodland Hotel." He admits that the separation of Jackson and his

wife was common talk in the neighborhood, and created a sensation and that his name was coupled with that sensation.

The Jackson family went to the Woodland Hotel to live about October, 1895, and it seems that Jackson went with them, but only stayed a short time, going back to the rooms over the laundry. Some time in the winter Mrs. Jackson was sick at the hotel and was attended by Dr. K. P. Jones, who called in Dr. Hetherington to consult with him in the case. She had pretty nearly recovered at the time of the killing. She was up and around the hotel and had been out a few times.

The rooms in the hotel first occupied by the Jackson family, at the time of the killing had been changed for four others, 26, 27, 28 and 31, on the second floor of the hotel; 26, 27 and 28 were along together and opening from one to another and were used, 27 as a parlor, and 26 and 28 for sleeping rooms, and 31, across the hall and a little ways down the hall, was used by Mrs. Jackson as her private room.

Reichel, Goddard's drug clerk, testified that once in the spring of 1895, Jackson came in the store and bought some cigars; Reichel waited on him, and after he went out Goddard said, "Reichel, I will have to buy me a good big gun." "Why," I says, "do you want a gun, Doc?" "Well," he says, "I expect I will have to shoot hell out of that son-of-a-bitch some day," just that way.

On the morning of April 2d, Goddard had been to the Woodland Hotel for some purpose undeveloped in the testimony before the court, and again in the evening, about eight or eight-thirty, he went for the second time for apparently no other purpose as shown by the testimony than to encounter Fred Jackson, the deceased. He had procured the gun spoken of and waited in the Jackson parlor alone from eight-thirty till his victim came. Goddard tells different stories about how he happened to go there that night. He told Stotler, one of de-

fendant's witnesses, a newspaper reporter, that he went out there on a social call. In his own testimony on cross-examination, he told the jury, "I was called there to see this woman." But his waiting there in the parlor an hour by himself, after being asked by Myrtle to "go in where her mama was," and never going in there till after he shot Jackson, goes far to disprove this statement.

In the deposition of William S. Bauer, the clerk at the drugstore at the time of the killing, the defendant apparently endeavored to have it appear that he was telephoned to, to take out a bottle of medicine, to which he assents in a very halting way, but this theory seems to have been completely abandoned by the defense at the time of the trial.

J. T. Deloe, a witness on the part of the defense, relates how Jackson told him a short time before the killing, that some one threw salt and pepper in his eyes one night on his way home. That Jackson thought it was Goddard who did it, and that since then he had carried a pistol to protect himself. That on the night of the killing witness saw Jackson at the Midland Hotel and he, witness, invited Jackson to go to the theatre with him and another gentleman, but Jackson declined, saying that he had an engagement for the evening.

When Jackson, the deceased, started to go out to the Woodland Hotel that fatal night, he was clean shaven with his mustache curled; he wore a light spring overcoat with a button-hole bouquet on the lapel. Physically he was a very weak man, very small and delicate; five feet four inches tall and weighing about one hundred and twenty pounds. "He was a man of very poor health, he was a very frail, delicate man, the man I would say was sort of a half invalid—wouldn't weigh much over one hundred and twenty pounds—he was nearly blind," so testified E. L. Bauer, an engraver, who had done much work for Jackson. Several other prominent business men

of Kansas City, men who had known him intimately for years, also testified to his being a small, frail, sickly, weak man and nearly blind.   He got to the hotel about nine o'clock, talked with some man near the office door, then his daughter Marie came into the office and spoke to him.   He put his arms around her and tapped her on the head, made some remark, they greeted each other friendly, sociably, and then they went up stairs together.   Marie went up the stairs and skipped ahead and told her mama he was coming, and then took him in where the defendant was, in the parlor.   For what was then and afterwards said in that room we must depend upon the defendant and his witnesses.   Marie says she told defendant to get out as her papa was coming; that defendant replied, "Well, all right, what is the difference if he is coming?"   She says when they got in the room the defendant started to shake hands with Jackson, and said "Howdy;" that Jackson said, "Hello, what are you doing here?" and told him to get out.   He started for the door and forgot his hat, and said he would "go back and get his hat," and when he got about middleways "Papa grabbed him by the arms and pulled out a revolver.   So Papa caught him by the arms and I grabbed the revolver.   We wrestled around for a little while, and I got the revolver away, and took it into Mrs. Stewart's room, and went in and told mama what had happened."   A few minutes afterwards she took the revolver into her mother's room; she did not know whether the revolver was her mother's or not.   She afterwards went back to the parlor, and was in and out several times; that her father and defendant were fussing over bills and medicine, drugstore and business, that her father called defendant "an infernal rogue, and things like that."

Goddard testified that when Jackson came in, "I advanced to shake hands with him, and he immediately began to abuse me:   'You infernal scoundrel, what are you doing here?'   'You

get out of here.' I started to go out without my hat. He took —I didn't see which way—had his revolver out; he took it from his overcoat. As he got near the door he got it out, and held it down the side of his leg; then he hid it from me; I took in the situation; I didn't dare go by. I then said, 'Mr. Jackson, I haven't got my hat,' I backed back to my hat, and he moved along slowly until I got in the neighborhood of my hat; I didn't know where it was. I turned to get my hat, and as I turned to get my hat the little girl screamed, 'Papa!' and as I turned she sprang on to his arm, and the struggle began from there. And she had hold of his hand and partially hold of his revolver, and I hold of his body and fetched the little girl and hand of his towards me, I just had hold of his body as soon as I could get hold of his right arm, why, he threw his left arm around me and put his leg behind me and came near throwing me. We struggled back; I succeeded in throwing my leg behind him, he went down to the floor—I saw he didn't have any revolver in his hand, so I let him up." Then according to Goddard they proceeded for the next hour to talk about financial affairs between them, and not a word of anything else for more than an hour except, "said I had exercised undue influence over his wife; said I had spirited her to the home of my brother-in-law—then says, 'You took my wife down into the court room?' he says; 'it is a good thing I didn't know it or there would have been a killing right there.' It was getting worse all the time; I said, 'Mr. Jackson, we can't agree on any of these things—I just as well go.' Both of us were sitting back towards the center of the room. He was on the south of me—he was at the north of me—I am not well acquainted with that parlor room; I don't remember the position exactly. I took a chair towards the door with a view of going through the door. Mr. Jackson comprehended my action at once. As I started towards the door he went quickly to the center of the

State v. Goddard.

door. He says, 'You don't get out of this room.' I began reaching for the doorknob, and at the same time he was trying to keep me away from the doorknob; from that we got into a scuffle; we scuffled north from the door until I got back, perhaps, three or four feet, somewhere north of the door, he was pushing me back from the door, when he threw himself loose from me and sprang back in the attitude of killing me, and says, 'I will kill you right here.'"

On cross-examination:

"Q. Why didn't you take that little fellow up and just toss him off to the middle of the room and walk out? A. He didn't look like tossing; if you had seen him.

"Q. He weighed about one hundred and twenty pounds, five feet four and a half? A. He got furious.

"Q. You let go of him? A. He sprang back from me.

"Q. Where did that land him? A. It landed him back somewhere north—neighborhood of the door.

"Q. Which way did you spring? A. I sprang from the center of the room, out east.

"Q. Then what did he do? A. Sprang back in that position, reached for his revolver and started towards me.

"Q. How far did he come towards you? A. He just had started.

"Q. Had he taken a step? A. Yes, he might have taken a step.

"Q. Might have taken one step? A. Yes, sir.

"Q. You are not certain of that? A. I don't know about that.

"Q. Did you see a revolver? A. I couldn't say he took a revolver out of his pocket.

"Q. Did you see any revolver in his hand? A. I can not say that I did. He told me he was going to kill me.

"Q. Were you in the same position you have described

when you shot the first shot—Jackson coming towards you from the south and west, and you north and east of him? A. That is to my memory, yes, sir.

"Q. He took, you think, one step towards you, and you fired? A. He advanced, that is all I know.

"Q. You got your revolver out quickly? A. Yes.

"Q. Hadn't seen any gun in his hand? A. He told me he would kill me and reached for it.

"Q. Had you seen any gun in his hand yet? A. I can't say I saw a gun.

"Q. He was facing towards you and standing up when you shot first? A. Yes, sir.

"Q. Where did you shoot him at that time? A. I don't know only what I heard in evidence.

"Q. What did you do immediately after shooting the first shot? A. Stepped around east.

"Q. You stepped to the east? A. Yes, sir.

"Q. Haven't you testified twice that you stepped in the other direction? A. No, I stepped towards the center of the room, further out from where I was at.

"Q. Had Jackson started to fall before you fired the second shot? A. Not that I saw.

"Q. Do you know whether he had or not? A. I know he hadn't.

"Q. And the second time you shot, you shot him with both hands did you? A. I shot with both hands; double action revolver.

"Q. In each instance you held the gun in both hands? A. I don't know, I shot as quick as I could."

When Marie left him and went up stairs to Frank Seymour's room she says, they sat near the door talking and seemed all right, Goddard on the south side of the door, and her papa on the north side. And according to Marie the shooting oc-

State v. Goddard.

curred about ten minutes after.

Mr. James Swift, a lawyer, at the time a member of the firm of Brown, Hadley & Swift, testified that he was coming down on the east side of Woodland avenue, south, between Seventh and Eighth streets, and noticed two men in the room on the northeast corner of the Woodland Hotel on the first floor above the sidewalk, which would be room 27. One man appeared to be standing, the other sitting; the larger man was standing; he gathered the impression there was a dispute from the movements and gestures; the larger man was gesticulating. He continued to see them as he passed down the slight incline of Woodland avenue, and when he left the curb to pass over to the northwest corner of Eighth street and Woodland avenue, the man who was standing appeared to turn and come towards the center of the room; he took some ten or thirteen steps from where he last saw the large man when two pistol shots rang out. This evidence tends strongly to disprove the story of the defendant about the struggle which took place just before the shooting. The position of the body of Jackson, the undisturbed condition of his clothing, and the flowers on his coat lapel also go to disprove the defendant's story of the struggle and Jackson's advance on him before the shooting. The head lay to the north, the feet to the south, his feet lay in front of the door so near that the door would strike them in opening. He lay slightly on his left side with his right arm across his body. On the lapel of his overcoat was a very nice button-hole bouquet; it was not disarranged in any way. His collar and cuffs were not disturbed or rumpled, except that the collar had a little blood on it, but the cuffs were perfectly clean.

Dr. Bedford, the coroner, testified that the body lay with the head due north, with the feet so near the door that in opening half way it would strike them.

Dr. Hetherington testified that almost immediately after

Goddard had been placed under arrest he went in to see Jackson and when he opened the door it struck his (Jackson's) feet.

The two wounds on the dead man and the bullet-mark on the door also tend to disprove defendant's story of the shooting. There were two wounds on the body, one was made by a thirty-eight caliber bullet. It entered the neck just above and a little to the right of the articulation of the two collar bones and the breast bone; the bullet went in at an angle and went in a straight line from the point of entrance inward, backward and downward, cutting the subclavian artery and lodging just under the skin at the lower portion of the right shoulder. It was a fatal wound, a mortal wound, a wound of that sort would kill a man instantly (testimony of Dr. W. S. Wheelor, deputy coroner). The other wound was made by a thirty-eight caliber bullet which entered the left temple and came out a little lower on the right side of the head, boring a hole straight through the front part of the head; this was a mortal wound, the shock from which would produce an instant collapse of the body. The bullet after passing through Jackson's head struck the door *eighteen inches from the bottom* and in nearly a direct line with the doorknob; the flattened bullet was picked up and handed to the coroner a few minutes later by Dr. Hetherington. No other bullet-mark was ever found in the room.

The last seen of Jackson alive by any witness but Goddard, he was sitting in a chair near the door. When found dead where he fell a few seconds later, he was lying quietly right where he would have fallen if he had been shot in the neck first while sitting in the chair where he was last seen, and shot again in the temple as he fell forward to the floor, and the bullet mark on the door was such as could have been made had it been sent through his head while falling and when his head was much lower than it would be in a sitting position. In order to establish self-defense, the defendant testified that Jackson was

standing up advancing directly towards him when the bullet went into the *side of his head* boring a hole straight through, then after it had gone through his head, it must have taken a short turn in *the air* downward, and then sideways, striking the door eighteen inches from the floor.

After defendant had shot Jackson, the first place he went was to Mrs. Jackson's room. H. D. Vinton who roomed on the half story below ran up the short stairs and had gotten down to room 31 and hearing voices stopped to listen and heard some one say in a man's voice, "If you will stick to me it will be all right, but if you don't I will implicate you." Then the door opened and Goddard walked out, and down the hall to the head of the stairs where he was met and stopped by Woolf, one of the proprietors of the hotel, who asked "where that shooting was," and he said that he "did it;" and Woolf asked him "what he shot," and he says, "I shot Jackson," and I says, "Did you kill him?" He says, "I think I did." I told him "he couldn't get out of the building." Dr. Hetherington came up, and he was taken to Dr. Hetherington's room which was close to the head of the stairs; while defendant was in the hall, some one asked him why he did it, and he said, "Jackson caught him in there, and he had to kill him to get out."

Frank Stewart, cashier of the Kansas City postoffice, and who roomed with his wife and sister-in-law at the Woodland Hotel, went into Dr. Hetherington's room while the defendant was there. He testified on behalf of defendant as follows on his cross-examination, about seeing Marie Jackson on defendant's lap with her arms around his neck.

"Q. Did you see her when she got on Goddard's knee or put her arms around him? A. She was sitting on Dr. Goddard's knee when I saw him.

"Q. What was she saying? A. I did not hear her say anything, they were both crying—I know Goddard was.

"Q. She was sitting there with her arms around him on his knee? A. If I remember rightly, she was sitting on his knee and she had her arms up over his shoulder around his neck.

"Q. Did they have their heads close together? A. Well, their heads were pretty close together.

"Q. How long did you stay in there? A. Well, I was in there but perhaps a minute."

James Fleming, a watchman, who was called into the hotel immediately after the shooting, found Goddard in Dr. Hetherington's room, and while there Marie came in. "She came in and says, 'Doctor, mama wants you to come to her room, she wants to see you.' Doctor leaned his head on me and commenced crying. She walked over and leaned her head against his face and says, 'Doctor, don't cry, you are all right, we will stay with you; we will say he drew a gun first.' She kind of made a leap to get in his lap; I moved her back and told her the doctor was under arrest and couldn't go.

"Q. What did she do? A. She went back to the door and says, 'Mama, the doctor is under arrest and can't come.'"

Dr. Hetherington, whose room was near the head of the stairs on the second floor, testified that while he was in his room Marie Jackson was there, and that "when I saw her she was either on his knee or partially, I wouldn't be positive, with her hands extended over the doctor's shoulders, that was her position.

"Q. What, if anything, did she say to him? A. She told him not to worry or not to cry, something to that effect, 'we will say papa pulled the gun first.'"

J. W. Woolf, one of the proprietors of the hotel, heard the same.

A most remarkable discovery was made by Dr. Bedford when he searched the dead body before ordering it removed

from the room in the hotel.    He found in the right hip pocket as he lay on his left side a small caliber, slick barrel, hammerless pistol, with the muzzle upward and a handkerchief on top of the pistol.

Two juries in two widely separated counties, and before two different special judges, have found the defendant guilty of murder in the second degree upon the foregoing facts.    The last jury, in a county remote from the place of the killing and far removed from any local prejudice, assessed his punishment at twenty years in the penitentiary.

I.    After the reversal of this cause on the former appeal, a change of venue was awarded to Cass county, and while the cause was pending in the circuit court of that county, a new indictment was preferred by the grand jury of Jackson county in the criminal court of Jackson county, and thereupon a nolle prosequi was entered by the prosecuting attorney of Cass county, and the defendant discharged from his recognizance in the circuit court of said county.    It is insisted by defendant that the dismissal of the case pending the first indictment in Cass county, was and is a complete bar to any other or further prosecution of defendant for the crime therein charged.    This point is much belabored, but is clearly untenable, either upon principles of the common law or any provision of our Constitution or statutes.    [Rex v. Stratton, 1 Douglass, 239.]

The State v. Wear, 145 Mo. 162, cited by counsel, is not applicable.    In that case the defendant was discharged because of the neglect of the State to bring him to trial under the provisions of section 4223, Revised Statutes 1889.    No such laches had occurred in this case, and there is not the slightest pretense that defendant was discharged for any such reason. The question on this record is whether the mere dismissal or quashing of a first indictment is a bar to a second prosecution on a second indictment for the same offense.    This point has

been so often adjudicated, it must be deemed settled.

In State v. Patterson, 73 Mo. 695, it appeared that the defendant had been indicted in Henry county and a change of venue awarded to Morgan county. Subsequently, a new indictment was found by the grand·jury of Henry county, and the defendant re-arrested upon a warrant issued upon said second indictment. Thereupon, in that case as in this, the first indictment was quashed and the defendant put on his trial and convicted. It was urged there, as it is here, that there was no jurisdiction in the grand jury .of Henry county to re-indict pending the indictment in Morgan county, but this court said: "It was perfectly competent for the grand jury of Henry county to find a second bill of indictment, notwithstanding a change of venue had been awarded to Morgan county. The circuit court of Morgan county was, indeed, possessed of the cause, but this did not prevent the grand jury of Henry county from finding another bill, any more than they would have been prevented had no change of venue been taken. The jurisdiction over the cause is one thing; the power and duty to find a new bill of indictment upon whose charges that cause shall be tried, is another and totally distinct and different thing. Our statute expressly recognizes the right of a grand jury to find one indictment pending another by providing that the first shall be quashed." [Sec. 2522, R. S. 1899.] And as to the motion to send the case on the new indictment to Morgan county and the refusal of the circuit court of Henry county so to do, this court further said: "It would, in the circumstances detailed, have been as palpably erroneous to have granted the motion, and by granting it sent the cause to the circuit court of Morgan county, as it would have been to have sent it to any other circuit court, whatever, because the jurisdiction of the Morgan Circuit Court over the case ceased at once when the action we have stated was taken."

The dismissal of the first indictment under the facts of this

case was in no sense a bar to a prosecution on the second. It was simply a discharge from the first indictment and not an acquittance of the offense as was the discharge in State v. Wear, 145 Mo. 162.

The language quoted from the opinion in that case must be read in connection with the whole opinion, and it is perfectly evident, when so read, that it is not authority for the position that the mere quashing of an indictment is a bar to a future prosecution.

Even if that indictment had not been formerly quashed, its pendency would not have affected the jurisdiction of the court to proceed on the second indictment. [State v. Eaton, 75 Mo. 986.]

As to the complaint that the quashing of the indictment in Cass county denied defendant the speedy public trial to which he was entitled, little need be said.

The record discloses no want of diligence in bringing defendant to trial. Indeed, he mentions one fact alone, tending to show delay, and that is that the trial in Cass county was set for January 30, 1899. He was indicted on the second indictment five days previous to the thirtieth, and we have been unable to find any cause of complaint as to the prosecution under that second indictment. It appears that the depositions he took for that trial were used on the trial in the Cole Circuit Court. We have no hesitancy in holding that the defendant was not denied a speedy public trial within the meaning of our Constitution and laws. [Nixon v. State, 2 Smed. & M. 507; Ex parte Stanley, 4 Nev. 116.]

As to the point so strenuously urged that, by sustaining a prosecution under a second indictment after a change of venue, we rest the right of a change of venue entirely in the caprice of the prosecuting attorney, this was also answered in State v. Patterson, 73 Mo. 695, in which it was said: "If the original

cause for the change of venue still existed, it was still as competent for the defendant to insist upon a change of venue as it was at first." If the original cause is removed he has no ground of complaint. If it does he can apply and obtain his change, just as defendant did in this case. This is the uniform rule in this court. [State ex rel. English v. Normile, 108 Mo. 121; State v. Billings, 140 Mo. 193.]

II.   The defendant was convicted of murder in the second degree on his trial under the first indictment, and upon his appeal that sentence was reversed for error of law. He now insists the State had no right to put him on trial for murder in the first degree under the second indictment, because by the verdict in the first trial he was acquitted of murder in the first degree. Section 23 of article 2 of the Constitution of Missouri, adopted in 1875, has abrogated the rule laid down by this court in State v. Ross, 29 Mo. 32, that where a conviction of murder in the second degree on an indictment charging murder in the first degree, has been set aside, the defendant can not again be tried for murder in the first degree. [State v. Billings, 140 Mo. 204; State v. Simms, 71 Mo. 538; State v. Bruffey, 75 Mo. 393; State v. Anderson, 89 Mo. 312; State v. Punshon, 133 Mo. 44.]

But in this case the defendant was convicted of murder in the second degree only—a grade of which he was convicted on the first trial, and of which he has never been acquitted. [State v. Billings, 140 Mo. 205.]

III.   It is further assigned as error that in overruling defendant's plea in abatement and his motion to discharge him, without submitting the same to a jury, the court denied defendant his right to trial by a jury, and thereby denied him due process of law and equal protection of the law.

This contention is made notwithstanding he submitted his said plea and motion to the court without asking for a jury.

The matter of the alleged plea in abatement was evidently submitted as upon an oral demurrer thereto. On the face of both the plea and the motion, no legal reason was disclosed why the indictment should abate or the defendant be discharged. The record alone was introduced. The identity of the defendant and of the offense stood conceded. Under these circumstances, questions of law alone were presented, and there was nothing to submit to a jury. The court could have rendered only one judgment, if a jury had been impanelled. It would have been compelled to instruct them that the records in evidence constituted no obstacle to a trial under the second indictment and, conceding all that the motion alleged, defendant was not entitled to be discharged.

As said in State v. Williams, 152 Mo. loc. cit. 120, "the legal efficacy of the record offered to sustain the discharge from the crime charged in the second indictment, was solely a question of law which the court was bound to decide," the question of identity both of the party and the offense, being admitted.

It was the duty of the court to declare the legal effect of the records offered to sustain the motion for discharge and the plea in abatement, and it correctly held they had no such effect as defendant claimed for them. [State v. Wm. Moore, 156 Mo. 142.]

IV. Error is assigned upon the admission of testimony by Frank Seymour that at the time the shot was fired which killed Jackson, his daughter, Marie Jackson, exclaimed, "Papa is shot."

To the question which elicited this exclamation, no objection was made at the time it was asked. Sometime prior to this interrogatory a question was asked of this witness and defendant objected "to any conversation with the Jackson girl as hearsay." The objection to the question asked at that time was

Vol 162 mo—15

overruled and defendant excepted. Some ten questions were then put to this same witness, to which no objection was made, and which seem' entirely unobjectionable, and then witness was asked what Marie said when she got into the hall after the pistol fired, and he answered, "She said, 'Papa was shot.' " We are now asked to hold the former objection and exception were sufficient to save the error as to this statement. We are clearly of opinion that it was not. Even after the answer came, no motion was made to exclude it. Timely objection and exception must be taken in order to avail the party in this court. [State v. Hope, 100 Mo. 347; State v. McDonald, 85 Mo. 539.]

But this can not be held to be reversible error in this case ffor another reason. Defendant in the examination of Maud Jackson brought out evidence of identically the same character and significance. She testified she heard the shots that killed her father. She was in her mother's room at the time (room number 31). Counsel for defendant then said, "Now, tell what happened immediately after that?" Answer. "Why, the shots were fired and mama ran to the door and wanted me to go— she wanted to go into the parlor; she says, 'I am afraid *Fred is killed.*' "

Having thus brought out the fact from which the same inference might be drawn, to-wit, guilty knowledge of defendant's purpose to kill the husband and father, it is difficult to see upon what principle this can be urged as error when elicited by the State. It has been ruled in various courts of last resort that a party can not complain that the court permitted a witness to testify against his objection to certain facts if subsequently on the same trial he admits the facts brought out over his objection. [People v. Marseiier, 70 Cal. 98; People v. Daniels, 70 Cal. 521; State v. Furney, 41 Kan. 115; State v. Palmer, 161 Mo. 152.]

Moreover, it was a fact that Jackson had been killed by the shot which Seymour and Marie heard, and was then dead in the parlor of the suite of rooms occupied by his wife and daughters, and defendant testifies he shot and killed him at that time. The point must be ruled against defendant.

V.   The admission of certain testimony by Mrs. Minninger is relied on as error.

An examination of the record discloses that counsel sat by and listened without objection to all of the testimony of this witness which was at all damaging, and after it was all in, simply said, "We object to all the above as wholly immaterial and hearsay," and saved no exception whatever.

It is not necessary to repeat that such an objection is not a foundation for a reversal of a judgment.

VI.   Error is further predicated upon the exclusion of the testimony of Mrs. Stewart to the effect that she saw Jackson's cuffs on the floor of the parlor, on the evening of the homicide and after the shooting.   Her evidence was offered in a deposition taken in Jackson, Ohio.   To the question as to whether she saw any wearing apparel of the deceased in the room that evening, she answered, "Yes, I saw his hat and his cuffs."

It appeared in the other portions of the deposition, that she did not, of her own knowledge, know they were his hat and cuffs, but was told they were by his daughter.   The State moved the court to exclude her answer because it was hearsay, and on this ground it was excluded.   Unquestionably this ruling was correct.   Until the witness of her own knowledge could identify the articles as belonging to deceased, their presence in the parlor was an utterly irrelevant and immaterial fact.   Indeed, we think her evidence should have gone farther, and shown that the cuffs were those worn by deceased that night.

VII.   When defendant was testifying in his own behalf,

he was permitted to state that in the fall of 1896, an estrange-
ment existed between Jackson, the deceased, and himself; that
it occurred about the time Jackson's family moved to the Wood-
land Hotel. He was asked what was the cause of that estrange-
ment, whereupon the court remarked: "I don't think you need
go into the cause of it. The fact is what you want."

To this, defendant excepted, but he went no further, and
made no offer to show any particular reason for the estrange-
ment beyond that shown by the State, the intimacy of defend-
ant with Jackson's wife. In the absence of such an offer, the
exclusion is no ground for reversal. If reversed on this ground
on a new trial the witness might answer it was the intimacy
already shown, or, indeed, that there was no cause. [Bank v.
Aull, 80 Mo. 199; State v. Martin, 124 Mo. 514; Lane v. Ry.
Co., 132 Mo. 4.]

At any rate, the fact that deceased might have had other
reasons than the illicit relations between defendant and his
wife would have been no justification of the homicide nor would
it have rebutted the theory of the State, as it would only have
shown an additional cause for ill-feeling on Jackson's part.
The ill-feeling was admitted by defendant, and that was the
ultimate fact which was to be shown by the proffered evidence.

VIII. The point made by defendant that the court erred
in admitting evidence of Jackson's physical condition, is with-
out merit. No authority is cited for such contention. In this
case it was exceedingly pertinent to inform the jury of the
relative strength and size of deceased and defendant. The de-
fendant testified that Marie Jackson had disarmed her father
an hour before the shooting, that he saw no weapon in his hand
when the final struggle began. It was for the jury to determine
whether defendant had reasonable cause to apprehend any great
bodily harm from the weak, puny and partially blind man
which this evidence shows Jackson to have been. No error was

committed in admitting this evidence.

IX. It is assigned as error that the court permitted testimony of various witnesses to show that in the fall of 1898, defendant met Mrs. Jackson, the widow of the deceased, near Rosedale, and rode with her in her buggy. Defendant had testified on cross-examination that he had never been anywhere with Mrs. Jackson after he killed her husband; that he never rode with her near Rosedale in the summer of 1898; that he was never in Rosedale in his life. Mrs. Jackson testified she had never seen or talked with Jackson since he killed her husband, and had never driven with him near Rosedale. This evidence, of which defendant complains, was a flat contradiction and impeachment of both of these witnesses. The continuing of their intimacy was also strongly corroborative of the State's evidence of criminal intimacy prior to the homicide, and of the motive for the homicide. It was competent and relevant. [People v. Pierson, 79 N. Y. 424; State v. Hinkle, 6 Iowa, loc. cit. 380; State v. Miller, 68 Miss. 221.]

While we think this evidence might have properly been received in chief, it was also rebuttal, and its admission in this order was largely within the discretion of the circuit court.

X. On the former appeal of this cause (State v. Goddard, 146 Mo. 184) we ruled that, after the State had elicited, on that trial, the fact that where Jackson was killed certain papers were found on his person, among others checks payable to defendant by Mrs. Jackson, the wife of deceased, which defendant claimed were forgeries, the prosecuting attorney should have produced the papers. On this last trial, it is insisted the court erred in excluding these checks, offered by defendant. The record discloses this state of facts in regard to this matter.

Frank Lowe, Esq., who was prosecuting attorney of Jackson county when the homicide occurred, and who prosecuted the case on the first trial, was called as a witness. Messrs. I. N.

Watson and W. S. Pope, among other counsel, represented the defendant.   He testified that when he went out of office he left all the checks that he received from the coroner in a cigar box in the drawer of his desk in the office.  After examination he testified unequivocally that every check he received from the coroner was present in court and in the hands of defendant's counsel.

Thereupon Mr. Watson, addressing the court, said:   "We now offer these in evidence, your Honor."

Mr. Pope:  "We'll not offer them now, just simply identify them."

Mr. Watson:   "I offer those (checks) now in evidence."

Mr. Reed:   "We object to them as wholly immaterial."

Stenographer:   *"No ruling."*

Later on the court said:   "I will reserve the ruling on the checks to the conclusion of the defense."

No further mention is made of these checks or the ruling of the court in the transcript so far as we have been able to discover.   Certain it is that counsel for defendant have not indicated where anything further was said or done.   The offer was not subsequently renewed.   It is plain the court did not absolutely exclude the checks but simply deferred his ruling thereon. That defendant so understood it there can not be a doubt, because no exception was taken to the court's action on the assumption that it was a refusal to admit the evidence.   In this state of the record we must hold that if defendant desired to save the point in this court, it was his duty to have the record affirmatively show that the offer first made was renewed and a ruling insisted upon, and if adverse, his exceptions were saved.  [State v. Taylor, 134 Mo. loc. cit. 140; State v. Owen, 78 Mo. 367; People v. Sanford, 43 Cal. 29.]

XI.   The instructions of the court are challenged, and error is assigned in the refusal of certain instructions, asked by

State v. Goddard.

defendant and refused by the court.

These will be examined in the order of defendant's brief. There was no error in refusing instructions 1 and 3 asked by defendant for the reason that the court's instruction on the law of self-defense was liberal as applied to the circumstances of this homicide, but outside of this consideration the first instruction was properly refused because it is predicated upon a state of facts foreign to this case.

Defendant was not pursuing his ordinary vocation in life when Jackson found him in his wife's apartments that evening. It appears that he went to that room armed with a deadly weapon. He told the jury he knew Jackson would kill him if he went to the Woodland Hotel, and yet he went to the private apartments of Jackson's wife and daughter. According to Myrtle Jackson, a witness for defendant, she left defendant in the parlor by himself when she started to an entertainment that night. He says he "was called there to see this woman" (Mrs. Jackson), but he waited alone in the parlor until Jackson came and never saw Mrs. Jackson until he had killed her husband. So that while this instruction might be correct under proper circumstances, it would have been misleading in this case.

As to the third instruction, there was no error in refusing it, either. Defendant's own evidence demonstrates that Jackson had no weapon in his hands. He had, moreover, seen Marie take her father's pistol out of the parlor an hour prior to the shooting. The killing seems to have been wholly unnecessary, even in the light of defendant's testimony. Jackson, physically, was a weak man, small and delicate, five feet four inches tall and weighing about one hundred and twenty pounds, and nearly blind. The defendant was a strong, athletic man, weighing one hundred and fifty pounds. So unequally matched were the two, that the giving of an instruction on self-

defense at all, under the circumstances, was an exceedingly liberal application of the principle. There was, so far as we can see, nothing requiring the court to go any further than it did in its instruction, on that subject. In that instruction it told the jury "If you find that at the time the defendant shot and killed Frederick J. Jackson, he had reasonable cause to believe and did believe that said Jackson was about to kill, or inflict great personal injury upon him, and that he shot him to avert such death or injury, then he must be acquitted on the ground of self-defense. In such a case, it is not necessary that the danger should have been real and impending, but it is sufficient if the defendant so believed and had reasonable cause for so believing, but the fact that he believed himself to be in danger would not be sufficient unless he had reasonable cause for so believing." Whether the defendant had "reasonable cause" to believe his life was in danger, was a question for the jury, and any attempt to further define these words would have been a comment on the evidence. There was no error in failing to define those words in the connection in which they were thus used.

XII.    Upon the evidence as it now appears, we are satisfied the defendant was either guilty of murder in the first or second degree, or was justifiable on the ground of self-defense. There was no evidence upon which to base an instruction for manslaughter in the fourth degree. The learned judge doubtless felt constrained to instruct on that degree on account of our opinion on the former appeal, and of course is not to be criticised for following what he deemed to be an express direction from this court. Inasmuch, however, as the jury found defendant guilty of murder in the second degree, no possible injury could have resulted to the defendant from the giving of that instruction. It becomes wholly unnecessary to discuss the criticism upon that instruction.

Counsel complain that no instruction was given on the burden of proof.  The court did. instruct that the jury must find the defendant guilty beyond a reasonable doubt, and defined reasonable doubt correctly.

We have patiently considered all the other criticisms of the instructions and find nothing in them which would justify a reversal of the judgment in this case.

XIII.  It is finally contended that if the quashing of the indictment in the Cass Circuit Court was not a final judgment of acquittal which would bar any further prosecution by the State, then the motion made in the Jackson Criminal Court, after the finding of the second indictment, to call in Judge LONGAN to try the cause under that indictment, should have been sustained.

A short recapitulation of the facts will aid in the determination of this point.  When the first indictment was found, Judge WOFFORD voluntarily made a record that he was disqualified to try the defendant and made an order, calling in Judge GEORGE H. LONGAN of the Pettis Circuit Court, who presided, and the defendant was convicted and sentenced to the penitentiary.  He appealed and the judgment was reversed. Judge LONGAN again went to Jackson county and took up the case, whereupon an application for a change of venue from the Jackson circuit was sought on account of the prejudice of the inhabitants of said county, which county constitutes a circuit of itself.  Upon a hearing of this application it was sustained, and the venue changed to the Cass circuit.  That case was sent to a county which was not in Judge LONGAN's circuit, and the change of venue thus granted by him divested him of all jurisdiction in said cause, and vested the same in the judge of the Cass county circuit.  As that county was not in the Jackson circuit, no authority was conferred by section 4178, Revised Statutes 1889, or by section 2597, Revised Statutes 1899, to

follow the case to Cass county and preside therein. In a word, the granting of the change of venue to another circuit court, by operation of law, completely severed Judge LONGAN's connection with the case. When the new indictment was found, Judge WOFFORD being still incapacitated to try the case, was fully authorized to call in Judge SHACKLEFORD. He was not required by any statute of this State to again call in Judge LONGAN. [State v. Silva, 130 Mo. 440; State v. Anderson, 96 Mo. 246.] The cases cited by counsel with reference to the special judge statute, have no application to the facts appearing on this record.

There was no error in calling in Judge SHACKLEFORD to try the case, nor in his trying the cause in his own circuit to which it was sent.

No doubt can exist as to the right of Judge WOFFORD to receive the indictment in his court, although disqualified to try the case. The law of the State imposed upon him the duty of providing a judge in his stead to try the cause. [State v. Silva, 130 Mo. 440; State v. Noland, 111 Mo. 473; State v. Wm. Moore, 156 Mo. 142.]

XIV. To the contention that by putting defendant on trial on the second indictment for murder in the first degree after he had been once tried and convicted of murder in the second degree, for the same offense, the court violated the fourteenth amendment of the Constitution of the United States, we can not give our assent. It is now held in many jurisdictions that it is perfectly competent for the State in its Constitution, or the Legislature in the absence of a prohibition in the Constitution, to impose the conditions upon which a new trial may be held. [People v. Keefer, 65 Cal. 232; Cooley's Cons. Lim. (6 Ed.), pages 400 and 401; State v. Veatch, 60 Ind. 291; Bailey v. The State, 26 Ga. 579; Bohanan v. People, 18 Neb. 57.]

So we have uniformly construed our Constitution of 1875. [State v. Simms, 71 Mo. 538; State v. Anderson, 89 Mo. 312.]

In Kring v. Missouri, 107 U. S. 221, Mr. Justice MILLER wrote the majority opinion and conceded the power of this State to change the rule announced by this court in State v. Ross, 29 Mo. 32, and State v. Ball, 27 Mo. 324. He says (loc. cit. 225): "There is no question of the right of the State of Missouri, either by her fundamental law or by an ordinary act of the Legislature, to abolish this rule, and that it is a valid law as to all offenses committed after its enactment."

As the people of this State adopted a new Constitution in 1875, which contained a provision that, "if judgment on a verdict of guilty be reversed for error in law, nothing herein contained shall prevent a new trial of the prisoner on a proper indictment 'or according to correct principles of law" (Constitution 1875, art. 2, sec. 23); and as in State v. Simms, 71 Mo. 538, and all subsequent cases, construing that provision it has been ruled by this court that this provision abrogated the rule laid down in State v. Ross, 29 Mo. 32; and as this provision was in full force when defendant committed the crime of which he has been twice found guilty, we hold that there is nothing in said section which contravenes the fourteenth amendment of the Constitution of the United States, or any other provision of that instrument.

By subjecting defendant to a second trial for the offense of murder in the first degree, after he had obtained a new trial for error of law in his conviction of murder in the second degree, the same rule was applied to him as has been and will be applied to all other persons in the State, under similar circumstances. [In re Converse, 137 U. S. 624.]

We have thus, at much labor, gone over the grounds upon which the defendant demands a reversal of his sentence. We find no reversible error in any one or all of them combined.

Two juries have found defendant guilty of murder and there was ample evidence upon which to rest their verdict.

The judgment of the circuit court is therefore affirmed. *Sherwood, P. J.,* and *Burgess, J.,* concur.